Hillary P. Carls
Sherine D. Blackford
BLACKFORD CARLS P.C.
602 W. Lamme Street
Bozeman, MT 59715
406.577.2145
406.219.0256 (fax)
carls@blackfordcarls.com
sherine@blackfordcarls.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| Catherine Cole, Barbara Koostra, Mary-Ann Sontag Bowman, and Rhondie Voorhees, | Cause No.: _____ |
| Plaintiffs, | |
| vs. | **Complaint & Jury Trial Demand** |
| Montana University System, University of Montana-Missoula, and John Doe Defendants 1-50, | |
| Defendants. | |

Plaintiffs, Catherine Cole, Barbara Koostra, Mary-Ann Sontag Bowman, and

Rhondie Voorhees, by and through their counsel of record, Hillary P. Carls and

Sherine D. Blackford of Blackford Carls P.C., complains and alleges as follows.

\\\   \\\   \\\

1

## Introduction

1.      In response to pervasive discrimination against women, in 1972, the United States took a monumental step forward to achieving gender equality in our educational institutions with President Nixon signing the Title IX of Educational Amendment of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX"). This visionary law provides:

> No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681 (emphasis added).

2.      University of Montana-Missoula ("UM") has long fostered and encouraged a culture, and the resulting actions, that "on the basis of sex" denied female employees the benefits of their long dedication to UM's educational programs. UM did not create a glass ceiling for these women's careers. UM created a brick wall for these women's careers.

## Parties

3.      At all times relevant hereto, Plaintiff Catherine Cole was a resident of Missoula, Montana and employed by UM.  Ms. Cole now lives in the United Kingdom.

4.      At all times relevant hereto, Plaintiff Barbara Koostra was a resident of Missoula, Montana and employed by UM. Ms. Koostra currently lives in Missoula.

5.      At all times relevant hereto, Plaintiff Mary-Ann Sontag Bowman was a

resident of Stevensville, Montana and is employed by UM. Dr. Sontag Bowman

currently lives in Stevensville.

6.      At all times relevant hereto, Plaintiff Rhondie Voorhees was a resident of

Missoula, Montana and employed by UM.  Dr. Voorhees currently lives in

Arizona.

7.      At all times relevant hereto, Defendant Montana University System

("MUS") is a Montana governmental agency, which operates the State of

Montana's public post-secondary educational institutions through the universities

and community colleges. The Board of Regents of Higher Education and the

Commissioner of Higher Education "supervise, coordinate, manage and control"

MUS, as outlined in Article X, Section 9 of the Montana Constitution, which

explains:

> (2) (a) The government and control of the Montana university system
> is vested in a board of regents of higher education which shall have
> full power, responsibility, and authority to supervise, coordinate,
> manage and control the Montana university system and shall
> supervise and coordinate other public educational institutions assigned
> by law. …
> (c) The board shall appoint a commissioner of higher education and
> prescribe his term and duties.

8.      At all times relevant hereto, Defendant UM is a public higher education

institution, which operates in Missoula, Montana.  Defendant UM is the flagship

campus of the University of Montana campuses.  UM maintains undergraduate, graduate, and professional courses of studies, and employs thousands of persons.

9.      MUS manages and supervises UM as one of the universities under MUS's authority.

10.     Defendants MUS and UM receive federal funds within the meaning of Title IX, 20 U.S.C. § 1681 *et seq*.

11.     Plaintiffs believe that the John Doe Defendants are subject to the jurisdiction of the State of Montana and this Court.  John Doe Defendants are parties that may have been involved in the occurrences set out herein, may have been agents of, employers of, employees of, franchisers or franchisees of, or contractually obligated to the named Defendants or are in privy with the named Defendants and, therefore, said John Doe Defendants may have committed one or more of the acts set out herein or may be responsible through tortuous interference, strict liability, breach of warranty, negligence, negligent misrepresentation, the law of agency, respondeat superior, franchise law or by contract for the acts of the named Defendants as set out herein.  Plaintiffs believe and therefore allege that the John Doe Defendants may have committed one or more of the acts set out herein and that they would therefore be liable for the same.  Plaintiffs will amend these pleadings as the case progresses to specify the various acts of the John Doe Defendants.

## Venue & Jurisdiction

12.   The events that are the basis of Plaintiffs' claims occurred in Missoula, Montana.

13.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1343.

14.   Plaintiffs bring this action to redress a discriminatory and hostile educational environment pursuant to Title IX, and Montana state law claims, as more fully alleged herein.

15.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' state law claims because they "form part of the same case or controversy…."

16.   The amount in controversy exceeds the minimum jurisdictional limits of this Court exclusive of interest and costs.

17.   Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2) and Local Rule of Procedure 3.2.

## Facts

18.   Title IX governs the Defendants' culture, actions, and policies related to gender because they receive federal funding.

19.   At all times relevant hereto, UM had adopted policies and procedures to implement requirements of Title IX.  *See, e.g.,* Discrimination, Harassment, and Retaliation Policy, Policy Number 373, Implementation Date August 14, 2020,

Responsible Office Equal Opportunity and Title IX (available at

https://www.umt.edu/eo/_docs/policy.pdf); Discrimination Grievance Procedures

Accompanying the Discrimination, Harassment, and Retaliation Policy, University

of Montana, Office of Equal Opportunity & Title IX (available at

https://www.umt.edu/eo/_docs/discrimination-procedures.pdf).

20.     UM historically has been the flagship institution of the Montana University

System, and for many years UM had the highest enrollment among the universities

in the State.  UM maintained a favorable reputation for its Business, Fine Arts, and

Sciences programs, and other professional programs, including the School of

Pharmacy and School of Law.

21.     UM athletics, particularly the men's football program, was a long-standing

source of pride for students, alumni, and Montanans.  UM athletics fostered not

only a source of income for UM, but attracted many persons to UM, including

students, employees, alumni, and community members.

22.     While these were some of the positive qualities of UM, it also fostered a

"good ol' boys club" culture, favoring male athletes and employees, while

excluding women from participation in activities and benefits regularly afforded to

their male counterparts.

23.     In September 2010, MUS appointed Royce Engstrom as UM President.

24.     Late 2011 started a dark and difficult period for UM, with the well-known sexual assault scandals and resulting U.S. Department of Justice's and Department of Education's investigations into UM for its handling of sexual assaults on campus and violating Title IX.

25.     Ultimately, these investigations resulted in:

a.      the Department of Education determining that UM violated Title IX; and

b.      the Department of Justice determining that UM "did not take sufficient effective action to fully eliminate a sexually hostile environment, prevent its recurrence, and address its effects."

Letter from U.S. Department of Justice, Civil Rights Division and U.S. Department of Education, Office for Civil Rights to The University of Montana at 7 (May 9, 2013).

26.     The scandals also led to Jon Krakauer publishing his best-selling book: "Missoula: Rape and the Justice System in a College Town."

27.     The sexual assault scandals generated fierce public sentiment.  Since 2011, UM's enrollment suffered historic declines, while Montana State University-Bozeman's enrollment has grown, exceeding UM's total enrollment by nearly double.

28.     After this difficult period, President Engstrom's tenure at UM ended on

December 31, 2016.  UM began its search for a new president to lead it out of this

arduous time of decline, hoping to regain UM's former glory.

29.     In 2017, MUS appointed Seth Bodnar as President of UM.  President Bodnar

was the non-conventional candidate without a doctoral degree or employment in

higher education administration.  Instead, he had corporate and military

experience, working as a former senior executive at the General Electric Company

("GE") following his graduation from West Point and his decorated military

career.

30.     Like UM, GE suffered from a precipitous decline, a federal administrative

investigation, and performance shortfalls.  GE also had its own pervasive issue

with gender discrimination, fostering patterns and actions that favored and

promoted male employees to the detriment of women. *See, e.g., Schaefer v.

General Elec. Co.,* 2008 WL 649189 (D. Conn. 2008) (settled outside of court for a

confidential amount).

31.     President Bodnar's other prior experience was with the military, an

institution long plagued with gender discrimination.

32.     As UM suffered the consequences of its unequal treatment of women,

President Bodnar took the reins.  Yet, President Bodnar's prior experience was

exclusively with institutions who had their own troubled past with gender discrimination.

33.     For professional women at UM, their already limited paths to professional success soon narrowed.

34.     Under President Bodnar's leadership and in violation of UM's policies and federal law, youth, perceived attractiveness, and/or fitness were relevant factors for women navigating a successful path. It was well known that under President Bodnar, the careers of the athletic-built women thrived, while older, less attractive women were publicly critiqued.

35.     Under President Bodnar's leadership and in violation of UM's policies and federal law, a retaliatory culture blossomed, creating significant risk of punishment for female professionals expressing challenging or dissenting statements.

36.     Under President Bodnar's leadership and in violation of UM's policies and federal law, UM intimidated women, threatening their careers as the consequence to asking hard questions or making hard statements.

37.     Under President Bodnar's leadership and in violation of UM's policies and federal law, women's choices and actions were unreasonably contradicted and questioned.

38.    Under President Bodnar's leadership and in violation of UM's policies and federal law, while men at UM had the opportunity to lead, contribute, and have long careers at UM, women did not.

39.    Ignoring the need to reevaluate its actions and the resulting treatment of women, UM's discriminatory culture persisted, creating a career-brick-wall for experienced, confident women.

40.    Upon information and belief, this discriminatory and retaliatory behavior continues today because female employees continue to fear retaliation and loss of their economic security by speaking out in this lawsuit.

41.    Defendants have acted with deliberate indifference towards UM's treatment of women, which includes failing to timely act to stop behaviors that violate UM's own policies and federal law.

42.    Upon information and belief, the Plaintiffs' experiences discussed below are only a few examples of this pervasive culture of a male domination and retaliation against experienced (often older) female professionals.

43.    Effectively, if a female employee acted as a whistleblower, UM retaliated against her. A culture of punishment persists.

44.    Plaintiffs suspect that many other women have had similar experiences. Plaintiffs reserve the right to amend this Complaint to include class allegations pursuant to Federal Rule of Civil Procedure 23.

## Catherine Cole

45.     In July 2018, UM hired Ms. Cole as its Vice President of Enrollment

Management and Strategic Communication.

46.     Ms. Cole came from the University of North Florida where she served as

Assistant Vice President of Enrollment Services and Director of Integrated

Marketing and Strategic Communication.  She had more than 25-years of

experience in higher education, and successfully increased brand awareness,

diversity, and enrollment for the institutions she worked for. *See* Curriculum Vitae

Catherine Cole (Exhibit 1) (discussing Ms. Cole's education and experience).

When she left the University of North Florida, she had increased enrollment by

44%.  Today, the University of North Florida continues to benefit from Ms. Cole's

strategic vision and implementation of infrastructure with enrollment, retention,

and graduation rates increasing above 75%.

47.     When Ms. Cole was hired, she was 50-years-old. Ms. Cole was not an

obviously athletic woman.

48.     Upon information and belief, President Bodnar did not want to hire Ms.

Cole, but the hiring committee uniformly selected Ms. Cole as the best candidate.

49.     At the time, Ms. Cole was the only female Vice President at UM.

50.     During her employment, Ms. Cole earned a starting salary of $170,000 annually.  UM paid Ms. Cole the lowest salary of its Vice Presidents, despite her exceptional qualifications, work ethic, and results.

51.     At the time UM hired Ms. Cole, UM had recently created the Vice President of Enrollment Management and Strategic Communication position for the President's cabinet, integrating marketing, communications, and enrollment into one position.

52.     As a senior executive on the President's cabinet, Ms. Cole's leadership responsibilities included marketing, communications, public relations, UM branding, recruiting students, faculty and staff, and engaging UM alumni, community members, and businesses.

53.     During her employment with UM, Ms. Cole received countless praise and accolades for her work performance.  Ms. Cole's work was improving the perception of UM and its enrollment.

54.     Despite Ms. Cole's excellent work, President Bodnar:

    a.     micromanaged her,

    b.     continually altered and changed her goals and job duties,

    c.     set unreasonable expectations,

    d.     informed her that she was moody,

    e.     asked her to smile,

f.     criticized how she communicated and the tone of her voice,

g.     belittled her, and

h.     commented about her appearance, including her weight, noting that

she could not be the face of UM.

55.    Despite being a Vice President of UM, Ms. Cole was excluded from

meetings with the Board of Regents.

56.    Ms. Cole became the only UM cabinet member who was second guessed,

interrupted, criticized, and questioned.

57.    This unprofessional toxicity and discrimination forced Ms. Cole to resign on

July 24, 2020.

58.    The working conditions at UM were so difficult for Ms. Cole that she was

compelled to, and had no other choice but to, resign.

59.    At all times prior to Ms. Cole's resignation, she was an employee in good-

standing. She was never the subject of a disciplinary action.  President Bodnar, her

supervisor, never poorly reviewed Ms. Cole.

60.    After Ms. Cole's forced resignation, Defendants hired two people to replace

Ms. Cole.

61.    Defendants' actions forced Ms. Cole's career path downward.  To escape

UM's discriminatory and toxic environment, Ms. Cole took a $40,000 pay cut and

moved away from her family to a smaller university.  Ultimately, Ms. Cole

continued to suffer from UM's discriminatory actions, and in 2021, she retired early, leaving higher education in total.

62.    Defendants further retaliated against Ms. Cole by eventually terminating her husband's position at UM, explaining that the funding for his position had ended. Despite this alleged funding issue, Defendants paid Ms. Cole's husband his salary for the 5-months remaining on his contract after his termination. Upon information and belief, Defendants are currently seeking to rehire his position.

63.    As a result of Defendants' mistreatment and discrimination, Ms. Cole has suffered from weight fluctuation, migraines, depression, anxiety, chest pain, vomiting, and increased kidney disease from the stress and dehydration.

64.    As a result of Defendants' actions, Ms. Cole has been damaged.

## **Barbara Koostra**

65.    In January 2005, UM hired Barbara Koostra to be Director of the Montana Museum of Art and Culture ("Museum").

66.    Ms. Koostra earned a B.M. at Northwestern University and an M.B.A. at UM. At the time she was hired, Ms. Koostra was previously the Executive Director for the Missoula Cultural Council, Communications Director for the Montana Arts Council, and Communications Specialist at the National Endowment for the Arts in Washington D.C. *See* Curriculum Vitae Barbara Koostra, M.B.A. (Exhibit 2) (discussing Ms. Koostra's education and experience).

67.    During her 14-year tenure at the Museum, Ms. Koostra expanded the Museum's permanent collection, doubling the value to approximately $25 million–$30 million, making it one of the most valuable and significant art collections in Montana.

68.    Ms. Koostra received more attention for the Museum and produced more programming than any previous Director in her position. Under Ms. Koostra's direction, the Museum presented over 60 exhibits, including Monet, Renoir, Rembrandt, Chagall, Picasso, Corot, Diebenkorn, Pulitzer Prize photographers, and other well-known and historic artists.

69.    She increased the financial viability of the Museum, raising over $1.5 million in operating, building and project funds.

70.    Ms. Koostra's fundraising efforts and donor relationships allowed her to maintain her salary, despite budget cuts by UM from 2007 to 2009, which eliminated much of the Museum's staffing.

71.    In 2019, President Bodnar and Interim Provost Paul Kirgis of UM asked Ms. Koostra to decorate the downtown Missoula Marriott with the Museum's permanent collection. Ms. Koostra directly questioned the appropriateness of this request because the public owns the artwork and the Marriott's facilities did not appear to have the security and climate control requirements necessary to protect the collection.

72.    In raising her concerns, President Bodnar and Interim Provost Kirgis accused Ms. Koostra of refusing to cooperate.

73.    Traditionally, Museum art is displayed at the UM President's house and office. Chelsea Bodnar, President Bodnar's wife, directed the President's staff to inappropriately handle and move art in those locations, ignoring the concerns of the Museum staff. This diminished and devalued Ms. Koostra's professional role as the Museum's Director.

74.    In September 2018, UM moved Ms. Koostra's office to McGill Hall, Room 212.

75.    She immediately noticed the stuffy, hot, fumy, odorous and dank conditions in her office.  Concerned with these work conditions, Ms. Koostra notified the "work-order desk" multiple times about the air quality problems. For weeks, despite attempting remedies, UM found no solution. Ultimately, UM vacated McGill Hall due to the extent of the asbestos problem, which it first discovered in Ms. Koostra's office.

76.    On November 13, 2018, Ms. Koostra emailed Dean Stephen Kalm about the poor work conditions in McGill Hall.  Approximately 2-hours later, the Provost's office contacted Ms. Koostra seeking to schedule a meeting.

77.     Six-days later, on November 19, 2018, the Provost notified Ms. Koostra that her contract would not be renewed because of budgetary constraints and reorganization.

78.     At the time of Ms. Koostra's termination she was 62-years-old and nearing the end of her career.  She had successfully served as the Museum's Director for 14.5-years.  Had Ms. Koostra reached 15-years, she would have been eligible for the Defendants' retirement benefits.

79.     During Ms. Koostra's employment with UM, she was an employee in good-standing.

80.     Despite the alleged budgetary concerns, UM ceased Ms. Koostra's work beginning January 1, 2019, but paid her another 6-months through the term of her contract.  UM paid her for 6-months during which UM prohibited her from working.

81.     Ultimately, Ms. Koostra's complaints about the poor working conditions in McGill Hall had merit because UM discovered asbestos in the building.  This was an especially important discovery given that McGill Hall housed UM's preschool.

82.     Despite its claim of reorganization, Defendants replaced Ms. Koostra with a male Museum Director with fewer qualifications and a higher starting salary than Ms. Koostra received when she began in this position.

17

83.     As a result of Defendants' actions, Ms. Koostra has received medical treatments and therapies.

84.     As a result of Defendants' actions, Ms. Koostra's successful career was cut short.

85.     As a result of Defendants' actions, Ms. Koostra fears for her health due to her asbestos exposure.

86.     As a result of Defendants' actions, Ms. Koostra has been damaged.

### Mary-Ann Sontag Bowman

87.     Dr. Sontag Bowman is a tenured associate professor in UM's School of Social Work.

88.     Dr. Sontag Bowman holds a Ph.D., MSW and BA in Social Work from the University of California Berkley.  She is also a Licensed Clinical Social Worker. *See* Curriculum Vitae Mary-Ann Sontag Bowman, Ph.D., LCSW (Exhibit 3) (discussing Dr. Sontag Bowman's education and experience).

89.     Dr. Sontag Bowman has been employed by UM since 2008, and is an employee in good-standing. Dr. Sontag Bowman has never been the subject of a disciplinary action nor received a poor review from her supervisors.

90.     She is currently 62-years-old.

91.     The School of Social Work, like the profession of social work, is dominated by women.

92.    The School of Social Work has more female than male students.

93.    Despite the School of Social Work primarily being filled with women, its leadership roles have long been held by men.  Like other programs at UM, UM's "good 'ol boys' club" mentality permeates into the School of Social Work.

94.    In 2020, at the encouragement of UM leadership, the only male faculty member and current chair sought a second 5-year term; effectively, foreclosing female leadership in the School of Social Work for a decade.

95.    In response, Dr. Sontag Bowman aptly observed:

> UM has a gender issue in leadership positions, and this email establishes a plan to have that continue in the School of Social Work. The optics and implications of a female faculty being led by a man – and years and years of male leadership in a female-dominated department and profession – are unfortunate.
>
> I find all that disheartening and disappointing – women need not apply is the bottom line.

96.    Had UM not discouraged other applicants by selecting its preferred choice, Dr. Sontag Bowman would have applied for this leadership position.

97.    After a successful 13-year career, and asset for the School of Social Work, Dr. Sontag Bowman has hit a career-brick-wall. Despite her qualifications, UM discouraged her opportunities for professional growth and leadership, while favoring her male counterparts.

98.    As a tenured professor, Dr. Sontag Bowman has repeatedly raised concerns over UM's poor male leadership and discriminatory treatment of women.

99.     When she served as Chair of the Faculty Senate, Dr. Sontag Bowman, among other actions:

    a.     brought to light President Bodnar's resume inaccuracies shortly after the Defendants hired him, and

    b.     challenged, with other faculty leaders, President Bodnar's plan to promote a male to an administrative position without searching for other candidates nor considering a diversity plan.

100.   Dr. Sontag Bowman has served as a whistleblower, bravely alerting UM to issues regarding its unequal gendered actions—including the ongoing male leadership in the School of Social Work, and President Bodnar's resume misrepresentations and failure to consider or address gender equity.

101.   Dr. Sontag Bowman has acted under the persistent fear of retaliation.  She is well-aware of UM's longstanding record of terminating female employees for speaking out, using excuses like budgetary cuts or reorganization to oust them.

102.   Dr. Sontag Bowman fears that she will be forever prohibited from achieving leadership positions or other opportunities for professional growth due to UM's pervasive favoritism of men.

103.   At times, Dr. Sontag Bowman has been accused of being a bully by male UM employees simply for ensuring proper payment of her salary.

104.   Only Dr. Sontag Bowman's tenure protects her employment at UM.

105.   If not for her age and gender, Dr. Sontag Bowman would consider leaving UM because she has hit her career ceiling, deprived of the benefits of professional growth offered to her male counterparts, and under the constant threat of retaliation.

106.   Before President Bodnar's tenure at UM, Dr. Sontag Bowman did not experience limitations. During President Bodnar's tenure, her career path hit a brick wall.

107.   As a result of Defendants' actions, Dr. Sontag Bowman has been damaged.

## Rhondie Voorhees

108.   In July 2012, UM hired Dr. Voorhees as the Dean of Students.

109.   Dr. Voorhees is a Missoula native and graduate of UM.

110.   Dr. Voorhees has a Ph.D. in College Student Personnel Administration and Higher Education, M.A. in College Student Personnel, and B.A. in Psychology. *See* Curriculum Vitae Rhondie L. Voorhees, Ph.D. (Exhibit 4) (discussing Dr. Voorhees' education and experience).

111.   She has over 30-years of experience working in higher education.

112.   In 2002, Dr. Voorhees served as legislative assistant on Title IX and other issues to Congresswomen Patsy T. Mink in the U.S. House of Representatives.  In 1972, Congresswoman Mink co-wrote Title IX. Dr. Voorhees assisted

Congresswoman Mink in writing her last historical reflection on Title IX,

published in the *Congressional Record* on July 17, 2002.[1]

113.   As Dean of Students, Dr. Voorhees served as a key member of a team of 14

student affairs offices and directors, including serving as UM's chief student

conduct officer, a member of the Behavioral Intervention Team (BIT), a member

of the Title IX case review team, and Chair of the Admissions Review Committee.

114.   Dr. Voorhees's responsibilities included providing direct support and

advocacy for students and families at UM.

115.   Dr. Voorhees took her role to ensure the safety and security of the student

body very seriously.

116.   UM hired Dr. Voorhees while the U.S. Department of Education and

Department of Justice investigated the sexual assault scandal at UM.

117.   As a result, UM involved Dr. Voorhees in discussions, policy revisions, and

many aspects of UM's response to the U.S. Department of Education and

Department of Justice investigations.  Dr. Voorhees evaluated both past and

current student cases.

118.   In this role, Dr. Voorhees became aware of many concerning situations and

often alerted UM of Title IX violations and safety issues. She made repeated

---

[1] After Congresswoman Mink's death and in her honor, the U.S. Congress passed the "Patsy T. Mink Gender Equity in Education Act of 2016," which seeks to support the full implementation of Title IX.

efforts to bring to light many concerns she had regarding student and campus

safety, especially for female students and faculty, as well as for her own safety as

Dean of Students.

119.   Despite the importance of the safety of UM's students and campus, and the

need for compliance with Title IX, Dr. Voorhees's reports were often met with

conflict, minimized, and/or entirely disregarded.

120.   Acting through Lucy France, now UM's Legal Counsel, and other leaders,

UM often overrode Dr. Voorhees' decisions to keep the campus safe. Ms. France

made decisions, took actions, and guided and/or advised senior administrators,

including the President towards decisions that put the safety of the campus,

students, and community members, especially women, at risk.  For example:

    a.      In 2012/2013, a female student disclosed to Dr. Voorhees that she had

    been raped by a male student.  Dr. Voorhees advised the student that she

    would have the Title IX Coordinator, then Lucy France, call her.  Ms. France

    responded that the student would need to make a written report and refused

    to confirm whether Ms. France would call her. Dr. Voorhees challenged Ms.

    France on this process.

    b.      In 2013, Dr. Voorhees received a report that a female student was

    threatening a male instructor because she was romantically infatuated with

    him. As Dean of Students, Dr. Voorhees recommended expulsion as a

sanction due to the severity of the circumstances. Ms. France advised President Engstrom on this matter, and under Ms. France's advice and guidance, the President overruled Dr. Voorhees' recommendation and reduced the sanction.

c.      In 2014, Dr. Voorhees was notified that a male student had been involved in an incident implicating felony criminal charges, had drug and alcohol addiction issues, and that his behavior was not in control. This student also missed a procedural deadline for his admission.  Given the missed deadline and security and safety concerns, Dr. Voorhees, as Chair of the Admissions Review Committee, denied him admission to UM. Ms. France, now Legal Counsel for UM, intervened and forced Dr. Voorhees to present the student's request to the Admissions Review Committee, who then admitted the student.  Dr. Voorhees was later devastated to learn her concerns about the male student were substantiated because another female student reported that the student had raped her.

d.      In 2015, a previous male student applied for readmission.  This applicant: (i) was a convicted felon recently released from prison; (ii) had a history of violently threatening female authority figures and harassing female students and faculty; (iii) had suspected serious mental illness; (iv) stalked a female faculty member; and (v) threatened to rape and kill another

official and her family.  Ultimately, the Admissions Review Committee

(chaired by Dr. Voorhees) decided they would not hear this case because of

the fear of being involved.  Instead, the Committee developed a strategy to

deny the applicant admission because this student presented a significant

threat to campus, especially to women. Upon appeal, Ms. France and another

administrator overruled the Committee's recommendations.

e.      In 2018, after a suspension, a male student had defamed Dr. Voorhees

and other UM officials online with bizarre behavior and writing.  UM failed

to keep Dr. Voorhees appraised of the dismissal of his complaints.

f.      In 2017 into 2018, Dr. Voorhees, and other UM officials, were

working with a male student with a felony background.  She had suspended

him due to his extreme bullying, aggressive, argumentative, demanding, and

threatening behaviors toward various people and offices across the campus,

especially women.  Dr. Voorhees had issued multiple no contact orders for

women employees and students.  This student repeatedly complained to and

abused Dr. Voorhees online and verbally.  The student was ultimately

incarcerated again and later released. Typical for these matters, Dr.

Voorhees had issued a "no trespass order" prohibiting this student from

being at UM. Ms. France requested information regarding the "no trespass

order", to which Dr. Voorhees explained that the student was such a threat to

campus and herself personally that others advised her to receive a personal order of protection against him.  Shortly after Dr. Voorhees's reply to Ms. France, UM eliminated the Dean of Students position.

121.   During her tenure at UM, Dr. Voorhees clearly and repeatedly communicated with UM through human resources and her supervisors her experiences, including her fears of retaliation, and safety and security concerns for the UM community.

122.   Dr. Voorhees's efforts to fulfill her obligations under Title IX and to the UM community subjected her to retaliation, culminating in the elimination of her position and employment with UM.

123.   Ms. France, exerted her influence over Dr. Voorhees' supervisors in retaliation against Dr. Voorhees for speaking out and doing her job.

124.   On August 14, 2018, under the pre-text of reorganizing, UM eliminated the Dean of Students position and terminated Dr. Voorhees's contract.  UM immediately placed Dr. Voorhees on administrative leave.

125.   Unlike the treatment provided to her male colleagues when leaving a position at UM, after placing Dr. Voorhees on administrative leave, UM unnecessarily humiliated Dr. Voorhees denying her access to her office, computer, email, and files, forcing her to leave the building, and escorting her to the parking lot.

126.   UM paid Dr. Voorhees for another 10-months, while prohibiting her from working, through June 30, 2019, when her contract term expired.

127.   At this time, Dr. Voorhees was an employee in good standing at UM, with a blemish free record. The Defendants never accused Dr. Voorhees of any wrongdoing.

128.   Despite Dr. Voorhees' dedication to protecting the UM community from dangerous individuals, UM retaliated against Dr. Voorhees for confronting these important issues.

129.   As a result of Defendants' mishandling of Dr. Voorhees's termination, she has been defamed by a student in Arizona and her reputation and career have been forever tarnished.

130.   As a result of Defendants' actions, Dr. Voorhees has been damaged.

## **Count 1 –Violation of Title IX**

131.   Plaintiffs reallege all the facts set out in foregoing paragraphs and alternate counts of this Complaint.

132.   Title IX of Educational Amendment of 1972, 20 U.S.C. § 1681, et seq., provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. …

27

> [A]n educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.

133.   The Defendants receive federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a), subjecting them to the requirements of Title IX.

134.   Defendants had notice when they accepted federal funding under Title IX that they would be liable for its actions that violate Title IX, including gender discrimination, harassment, and retaliation.

135.   Plaintiffs are members of a protected class.

136.   The Defendants had actual knowledge of the persistent violations of Title IX, including the allegations outlined above.

137.   The Defendants were deliberately indifferent to these allegations, and failed to take any action to remedy the situations in violation of UM's policies and Title IX.

138.   The Defendants subjected Plaintiffs to unwelcome harassment, retaliation, and humiliation, "on the basis of sex," with such frequency, severity, and pervasiveness that it created an abusive work environment and interfered, and continues to interfere, with the Plaintiffs' work performance.

139.   The Defendants created an unsafe work environment for the Plaintiffs because UM failed to provide a work environment free from physical, financial, and professional threats and retaliation based on gender.

140.   The Defendants failure to comply with Title IX has damaged and threatened Plaintiffs' financial security, career security, and physical security.

141.   The Defendants knew, or should have known, that "on the basis of sex," the Plaintiffs were "excluded from participation in[,] denied the benefits of[, and] subjected to discrimination" at UM.

142.   The Defendants should have immediately taken action to:

     a.     End the harassment,

     b.     Eliminate the hostile environment,

     c.     Prevent recurrence, and

     d.     Remedy the effects.

143.   The Defendants failed to take any of these actions in violation of UM's policies and Title IX.

144.   Instead, Defendants took adverse action against the Plaintiffs, forcing Plaintiffs to resign, terminating their position, and/or creating no options for professional growth.  All of these actions evidence the Defendants' failure to adequately respond.

145.    Plaintiffs were qualified for their positions at UM, and were subjected to adverse employment actions despite their qualifications.

146.    Similarly situated men in Plaintiffs' roles did not receive the same treatment as Plaintiffs.

147.    Defendants retaliated against the Plaintiffs based on gender.

148.    Defendants created such a seriously hostile environment "on the basis of sex" that Defendants denied and/or limited the Plaintiffs' participation at UM.

149.    Defendants' actions were in direct violation of UM's policies and federal law.

150.    As a result of Defendants' actions, the Plaintiffs have been damaged in an amount to be determined at trial.

## **Count 2-Breach of Covenant of Good Faith and Fair Dealing**

151.    Plaintiffs reallege all the facts set out in the foregoing paragraphs and alternate counts of this Complaint.

152.    Defendants entered into contracts with Plaintiffs.

153.    Each contract contains an implied covenant of good faith and fair dealing.

154.    Breach of the covenant is a breach of the contract.

155.    A breach of an express term of the contract is not a prerequisite to a breach of the implied covenant.

156.   The conduct required by the implied covenant is honesty in fact and the observance of reasonable standards of fair dealing in the trade.

157.   Defendants breached the implied covenant of good faith and fair dealing by depriving Plaintiffs the Title IX benefits to which they were lawfully entitled.

158.   As a result of Defendants' actions, the Plaintiffs have been damaged in an amount to be determined at trial.

## Jury Trial Demand

Plaintiffs hereby demand trial by jury on all issues.

## Prayer for Relief

WHEREFORE, Plaintiffs pray judgment against all Defendants, jointly and severally, as follows:

1.   For a judgment in favor of Plaintiffs and against Defendants on all Counts.

2.   For declaratory judgment declaring Defendants' discriminatory practices violate Title IX, UM's policies, and Montana law.

3.   For injunctive relief directing Defendants to cease these discriminatory practices.

4.   For compensatory damages in an amount to be determined at trial to compensate Plaintiffs.

5.   For damages in an amount to be determined at trial for all past, present, and future mental anguish and emotional distress.

6.     For all costs, including but not limited to expert fees, incurred in the prosecution of this action.

7.     For an award of interest, as deemed appropriate by the Court and as allowed by law.

8.     For an award of attorney's fees, as the same may be allowed by law.

9.     For such other and further relief, both at law and in equity, as the Court shall deem just and proper.

 Dated this 4th day of August, 2021.

       BLACKFORD CARLS P.C.

       /s/  Hillary P. Carls
       /s/  Sherine D. Blackford
       Hillary P. Carls
       Sherine D. Blackford
       *Attorneys for Plaintiffs*