

# UNIVERSITY OF MONTANA
# Recommendations for Programmatic and Organizational Change

Submitted by:

Jody Shipper and Cherie A. Scricca

July 11, 2019

## I.     INTRODUCTION:  Motivation, Commitment, and Process

The University of Montana (UM, or University) has requested this review based on their desire to build upon and improve UM's work in addressing campus sexual assault and safety, and to identify areas for improvement in sustaining a safe campus and also creating a more inclusive campus community.  The reviewers were also asked for suggestions of action steps that can be implemented in order to achieve their identified goals.

Through the process of conducting this review, it has become apparent that UM is fully committed to fostering a campus that is safe and inclusive, and they appear unafraid of the hard work it will take to build and maintain a healthy campus culture.  It is also apparent that the University has already done tremendous work regarding its Title IX obligations, and is to be commended for those actions and efforts.  UM has committed itself to being a safe environment for students, staff and faculty to study, work and live and to be a place where individuals from diverse backgrounds can thrive.

In order to better understand the extensive work already undertaken, as well as the areas for improvement, the reviewers spent three days on campus meeting with various students, staff, and faculty to learn about current processes and programs that support and encourage safety, diversity and inclusion at the University, and to better understand the factors that impede progress and the ability of the University to fulfill its commitment to these goals.  In addition, the reviewers conducted follow-up interviews, and also reviewed relevant websites and policies.

As a result of our many discussions, as well as a review of University policies and procedures relating to sexual assault, harassment, and discrimination, the reviewers offer the following recommendations designed to assist UM in creating a safer, and more diverse and inclusive campus community.

This report reviews best practices, required practices and metrics against which to measure the campus's efforts, along with suggestions for implementing each of those practices.  The report then addresses additional recommendations that the university might consider as part of its commitment to being a place where individuals from diverse backgrounds can be safe from harassment and discrimination, and thrive.

## II.    BEST PRACTICES, REQUIRED PRACTICES, AND METRICS AGAINST WHICH TO MEASURE THE CAMPUS'S EFFORTS

The creation of a campus safe from harassment and discrimination requires efforts from multiple sectors of a university, coordinated centrally, but with each contributing sector having a separate and distinct role to fulfill.  For example, if a student comes forward to report a sexual assault, one part of the institution would respond in a victim-centered manner, offering support and appropriate resources, and, if appropriate, advice regarding the Title IX reporting process.  This victim-centered response needs to be separate from the investigation and adjudication processes, which, while respectful of all participants, must be neutral and impartial.   Both of those pieces are separate from the law-enforcement and Clery Act obligations of the campus police department.  This is but one example of the manner in which pieces of the overall institutional response need to be coordinated, yet distinct.

In keeping with this need to have both a coordinated, centralized response yet multiple separate response efforts, the reviewers sought to identify both the university's existing response efforts (whether by individuals, committees, or teams) and the institution's coordination efforts.

An institution's legal and compliance obligations of an institution to respond to allegations of gender-based harm are derived from several sources:  Title IX of the Education Amendments of 1972; the Department of Education's Office of Civil Rights (OCR) guidance documents that set forth the department's interpretation of Title IX obligations; statutory procedural requirements set forth in the Violence Against Women Act (only applicable to specified acts of violence); state and local laws; and, case law.  In addition, adopting national best and emerging practices can also provide a measure against which any institution can view its practices and procedures.

*OCR Guidance*
While not statements of the law, OCR Guidance documents are considered to be "significant guidance documents" providing information and examples to inform recipients about how OCR determines if covered entities are complying with their legal obligations.

OCR's  2001 *Revised Sexual Harassment Guidance, Harassment of Students by School Employees, Other Students or Third Parties* "provides the principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance."  The guidance was

not intended to address private actions, but instead the government's view of a school's appropriate response to discrimination." The 2001 guidance, while noting there is "more than one way to respond," sets forth its expectations of specific elements that schools should have in place.  Those specific elements remain in place today.  The 2001 guidance also makes clear that, while any response must be "effective," effectiveness is to be measured on a reasonableness standard, and that "procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience."

In 2011, the Office of Civil Rights sent out another Dear Colleague Letter further clarifying a school's responsibilities under Title IX.  While the guidelines set forth in the 2011 letter have since been withdrawn, many of the principles contained in that document continue to live on, in the form of student expectations, elements that have been adopted into case law and state legislation, and, in some cases, as standard best practices.  In 2017, the Department of Education rescinded the guidelines put in place in 2011 and the Department's interim FAQ put in place in 2014, however left in place Guidance documents regarding the proper role of a campus EOAA/Title IX Coordinator.

*Resolution Agreements and Case Law*
Some best practices are derived from resolution agreements between individual schools and OCR over the past several years.  These resolution agreements are of limited value, as they pertain to circumstances particular to each individual school and the complaint that sparked OCR's involvement.  Nonetheless, some contain a helpful view of common practices that contribute to a better understanding of national best practices.  These practices include the importance of clarity in communications, the need to centralize all reporting in order to ensure the EOAA/Title IX Coordinator has the data necessary to conduct a system look for patterns and concerns, and the need for multiple forms of training, among others.  Recent case law also offers reminders of both legal requirements and as well as best practices.  For example, those cases that focus on the adjudication process contain lessons on the need to consistently follow polices as written, to provide equity for both parties throughout the process, and discussions of the expectations of process due in an administrative proceeding.  Those cases that focus on the institution's obligation to respond to allegations of harassment contain lessons regarding timeliness of a response, the need to coordinate a response amongst different campus offices, and expectations regarding interim supportive measures, for example.

*Violence Against Women Act (VAWA)*
In cases of stalking, dating or domestic violence, or sexual assault, the Violence Against Women Act amendments to the Clery Act add specific procedural requirements when responding to allegations.

*Best and Emerging Practices*
Separate from these practices that have been specifically required by statute, various best practices have developed in part from case law as well as  their successes and challenges following their implementation.  All of the best practices have the goal of taking sufficient action to identify and eliminate a potential hostile environment, prevent its recurrence, and address its effects for both individual complainants or the broader campus community.  These best practices also include clarity and consistency ("do what you say you will do"), proper mechanisms to ensure due process and fundamental fairness, and the understanding that being trauma-informed cannot diminish a respondent's rights to a fair, neutral and impartial process.

Practices designed to support the creation of a diverse and inclusive campus are rooted in many of the same sources and concepts.  In addition, EEOC guidance documents, studies on the impact of Affirmative Action efforts, and knowledge of practices that have yielded successful results also inform the practices listed here.

Thus, when taking into account all of the above, the following standards emerge:

## A.  INFORMATION AND RESOURCES TO HAVE IN PLACE

<u>Clear Communication:  Information and Contacts are Available at all Times</u>
One main website[1] should contain all necessary information regarding harassment and discrimination issues, including sexual assault, dating/domestic violence, and stalking.  The information should be useful to complainants, respondents, and any community member who needs to quickly access information regarding UM's processes, practices, and available resources.  It is important that the website can be found within 3 clicks or less from the University's main website.  Such a website should include information such as:

   a.  Name of the university's EOAA/Title IX Coordinator, and contact information;
   b.  Information on drug testing if a victim believes they were given an illicit drug;
   c.  Information on how to collect and preserve evidence;

---

[1] Any such website should also have an escape button that can quickly be hit, so that the website user's browsing history is immediately cleared and the user taken to a neutral webpage, such as google.com, or a general news site.

UM 6958

    d.  Information about campus police department assistance in gathering evidence or making a law enforcement report;

    e.  Information about confidential and non-confidential reporting options, with a clear demarcation between confidential and non-confidential resources;

    f.  Notification about resources, including on-campus and off-campus medical care, counseling, mental health, advocacy, legal assistance, and other services available on campus, in the community, or via a hotline;

    g.  Notification of any rights guaranteed by UM;

    h.  Information about retaliation, including both the prohibition against retaliation and also information on how to report suspected retaliation;

    i.  A statement that all proceedings shall include provide a prompt, fair, and impartial investigation and resolution;

    j.  Information about changing academic, living, transportation, and working situations as well as any other interim measures that might be available, and how they are accessed;

    k.  Links to relevant policies, including a list of all potential sanctions;

    l.  An explanation of reporting options for acts of protected class harassment other than sexual assault, and for discrimination claims[2], and,

<u>Additional Information Specific to Victims of Sexual Violence</u>

    a.  Information on how to get a forensic exam and medical care, including safe and accessible transportation options;

    b.  A statement that all proceedings shall include provide a prompt, fair, and impartial investigation and resolution, and be conducted by officials who receive annual training on issues related to domestic violence, dating violence, sexual assault, and stalking, as well as training on how to conduct an investigation and hearing process that protects the safety of victims, promotes accountability, is free from bias, and ensures a fair process for both parties;

    c.  Information about how the university will protect the confidentiality of victims, including how publicly-available recordkeeping will be accomplished without the inclusion of identifying information about the victim, to the extent permissible by law;

    d.  Information on safety planning and court orders for victims of dating/domestic violence and stalking.

---

[2] Some institutions find it more convenient to separate out the information regarding sexual assault, dating domestic violence, and stalking, and to have that information on one website with information on other forms of harassment and discrimination on another page or site.  There is not one best practice, as long as both sites are easily located and link to each other.

<u>Confidential Support and Easy Access to Medical Services</u>
Confidential support should be available in person or by phone 24/7, so that a victim can receive accurate advice on any immediate decisions that must be made, as well as advice on how to access medical care and/or a forensic exam, as well as information about reporting options.  Free, easily-arranged transportation should be available.  If transportation is provided by UMPD, it is imperative that a victim not be required to provide identifying information in order to receive transportation assistance.

<u>Support for Complainants and Respondents</u>
Both Complainants and Respondents should be offered resources to assist with interim measures, provide them information about the process, and offer information regarding other resources.  Generally, the EOAA/Title IX Coordinator should be available to provide assistance regarding interim measures, and should always be contacted to ensure that any interim measure is appropriate.  The EOAA/Title IX Coordinator can also provide information to each party about the response and resolution process and offer information about other resources, but national best practices dictate that another office (generally, one for complainants and one for respondents) staffed with individuals familiar with the university's processes be available for these purposes.

## PRIORITIZATION LEVEL and SUGGESTIONS FOR IMPLEMENTATION
This information should be available immediately, and these resources should be available in all cases, to all parties.

Following the onsite visit, the reviewers understand from those interviewed that UM has in place the pieces outlined above.


### B.  RESPONDING TO REPORTS
The following elements should be part of the university's response protocol.

<u>Policies are Consistently Followed</u>
- Reporting policies and procedures are easily found and clearly communicated (see above);
- Training is provided for all who have a responsibility to carry out the policies and procedures; and,
- Stated policies and procedure are followed by all who have a responsibility to carry out or operationalize the policies.

UM 6960

Outreach

Upon receipt of a report of sexual assault, harassment, or discrimination, the EOAA/Title IX Coordinator[3] should reach out to the individual impacted (if the identification is known or can easily be determined without violating confidentiality) to provide information regarding rights, options, and resources.  It is a best practice to provide the information in writing (hard copy brochure or email) along with an invitation to meet with the EOAA/Title IX Coordinator.  Outreach should be done by email and/or phone.  If there is no response, at least one follow-up email should be sent that makes clear that the individual is welcome to contact the EOAA/Title IX Coordinator at a later date for additional information about resources and options.

Initial Intake

If complainant is willing to meet with the EOAA/Title IX Coordinator, the EOAA/Title IX Coordinator should make clear that an investigation is not the sole option available.  The EOAA/Title IX Coordinator or an appointed intake coordinator will, when possible, separate the intake discussion from any forensic interview so that a complainant can first learn about their options and available resources before making a decision on how to proceed.  The sole purpose of the intake meeting is to provide information to the complainant, and to gather just enough information so as to be able to make an assessment of individual and community safety.  The purpose of this initial meeting is not to complete a lengthy interview that will become part of the investigation.  Any discussions that take place during the initial meeting should be documented.  Also, any reports of sexual assault, stalking, or dating or domestic violence that may have taken place within the university's Clery geography should immediately be reported to UMPD.

Alternative Resolutions

The EOAA/Title IX Coordinator should be authorized to determine whether an alternative resolution would be appropriate, and when it is not appropriate.  It is important to note that alternative resolutions may be considered "informal" as compared to the formalities of the investigation process, but all alternative resolutions must be documented.  Alternative resolutions should always be voluntary, and should not discipline the accused who, by the very definition of not having gone through the formal investigation/adjudication process, did not have the opportunity to meaningfully respond to the allegations together with all necessary procedural protections.

---

[3] Or individual designated by EOAA/Title IX Coordinator.  It is important that a non-confidential individual be the one in this role, so that outreach efforts can be properly documented.

No Contact Directives

In the event a no-contact directive is put in place, best practices as well as recent OCR resolution agreements suggest that a meeting should be held with each party to ensure that each understands the full constraints and can raise any concerns or questions, and also to ensure that each party understands how to report violations of the no-contact directive.  The details of any no-contact directive should to be worked out on a case-by-case basis, taking into account any particular educational, living, or programmatic needs of the parties, as well as the nature of the particular allegation.

Adjudication/Investigation Summary of Foundational Practices and Procedures
- If an investigation is requested but will not be conducted, the complainant should be notified in writing that an investigation will not take place, along with the rationale;
- Prior to the start of an investigation: both parties should receive simultaneous written notice of investigation that includes a summary of the allegations, a reference to the specific section(s) of the applicable policy that was allegedly violated, an explanation of procedures to be followed during the investigation, information about available resources, a copy of the applicable policy, and be informed of their rights to offer relevant witnesses and evidence, review all evidence prior to completion of the investigation, and have an advisor;
- During an investigation:  relevant witnesses should be contacted and considered; relevant evidence should be considered; and parties should receive updates especially regarding deadlines and timeline of the investigation.  All investigation delays are to be approved by the EOAA/Title IX Coordinator, documented, and then communicated to each party;
- All parties should be shown a copy of the notes from their interview and asked to ensure that the notes are correct, and provide any necessary corrections;
- Both complainant and respondent should be provided with the opportunity to review and comment upon all evidence gathered, and to request any follow-up evidence or questioning[4];
- At the conclusion of the investigation, parties should be simultaneously notified of the outcome of the investigation and notified of appeal rights and procedures and how to see copy of report.  If notice of investigation outcome is sent to any campus administrator it should be accompanied by a reminder of confidentiality;
- Investigation reports should contain: a statement of the allegations/issues, applicable sections of the policy, positions of the Complainant and Respondent,

---

[4] Although still an emerging practice, some institutions also provide a copy of the draft report (without conclusions) to each party for review and comment as part of the investigative process.

UM 6962

summary of the evidence, explanation why any proffered evidence was not investigated, findings of fact, analysis facts and fact-finding using preponderance of the evidence;

- Both parties should be notified simultaneously of final determination of the case, sanctions applied, and any changes following an appeal;
- Discipline assigned should be designed to end the harassment and prevent its recurrence; and,
- In the event a respondent is suspended, prior to a return to campus, a meeting should be held with each party to ensure that individual's readiness to return.

## PRIORITIZATION LEVEL and SUGGESTIONS FOR IMPLEMENTATION

At a minimum, these foundational steps should be followed in all cases.

To ensure that all of the above steps are met on a consistent basis, the reviewers suggest that the individual charged with oversight of the EOAA/Title IX Coordinator oversee a self-check together with the EOAA/Title IX Coordinator twice a year to ensure that all steps outlined above are followed.  The results of such a self-check should be shared with the President's Cabinet which can ensure that the review takes place, and that any necessary corrective action is promptly implemented.

## C.  DATA GATHERING AND ANALYSIS

The gathering and reviewing of data are critical components in the development of a successful sexual assault prevention program, and help create a more diverse and inclusive campus.

There are several types of data that should be gathered and then assessed.  First, all allegations of harassment or discrimination should be reported to the EOAA/Title IX Coordinator, even when the report is missing critical pieces of information (names, exact location, date, exact description).  In this manner, the EOAA/Title IX Coordinator can better monitor for patterns or systemic concerns, and identify ongoing training and prevention needs.  The data that should be gathered includes:

- Name, title and contact information of reporting party
- Name, title and contact information of complainant
- Name, title and contact information of respondent
- Location of incident

UM 6963

- Type of incident (discrimination, harassment, sexual assault, dating/domestic violence, stalking)
- Method used to address and resolve the issue (alternative resolution, investigation, other)
- Outcome of the resolution method (respondent found responsible for violating policy, respondent not found responsible for violating policy, other)
- Discipline or other corrective action applied if any
- Any change in status on appeal.

It is also noted that, for any systemic review to be effective, input from various repositories of critical information is essential.  For example, campus mental health and medical providers could provide de-identified aggregate data on alcohol and drug usage, an increase or decrease in confidential reports of sexual assault, trends in student mental health cases, and other valuable information.  Similarly, data on alcohol-related transports, if any, might provide an additional data point that would be useful in designing data-driven prevention education efforts.  Data regarding the number of individuals served by SARC for issues related to sexual harassment or sexual assault would be useful in determining the type of support services needed and resources needed to provide such service, and another data point useful in designing prevention education efforts.  Exit interviews and campus surveys are also an important tool for discerning patterns of harassment or discrimination, or a lack of diversity or inclusion.  Finally, data produced as part of the UM's Affirmative Action Plan, along with retention (student, staff and faculty) data, are other critical components needed to get the full picture of the university's status, so that changes over time can then be noted

## PRIORITIZATION LEVEL and SUGGESTIONS FOR IMPLEMENTATION
Of initial importance is the gathering and maintenance of the relevant data.  If not already underway, this effort should begin as soon as practicable.

Information related to campus safety including data regarding sexual assaults, dating/domestic violence, and stalking should be reviewed quarterly by a team including the Title IX Coordinator and representatives from UMPD, SARC, Student Affairs, and the Health Center.  At the time of this review there is not any formal process for reviewing and analyzing the data gathered by the institution regarding incidents of gender-based harm and the factors that may contribute to such harm (for example, data on alcohol transports, alcohol or drug use by students, or data on other student disciplinary matters).  The lack of a process for reviewing and analyzing data gathered is

UM 6964

a missed opportunity for the institution to adjust and improve training and prevention efforts.

Information related to diversity and inclusion efforts, should include the formation of a team to review the data on an annual basis.  To ensure both coordination and accountability, it is recommended that one main diversity committee be identified and use the data gathered to produce a report identifying goals, steps taken, and progress made.

## D.  TRAINING

At a minimum, the following training programs should be considered:

a.   Incoming freshman students should receive a short, clear, streamlined 20-30 minute training immediately prior to starting classes on four key topics: (1) the university's definitions of discrimination, harassment, sexual assault and consent, (2) the role of alcohol and its impact on an individual's capacity to consent to sexual activity, (3) how to make a report of harassment, discrimination, sexual harassment or sexual assault and how to access resources, and (4) top tips for being a good bystander.  The training should be mandatory, with consequences (e.g. hold on registration) for those who do not take the training.

b.   Within a few weeks after the start of the academic year, incoming freshmen should receive additional training that includes more information on recognizing signs of inappropriate conduct and learning how to intervene, what happens with a student's information once a referral is made to EOAA/Title IX, and an explanation of the overall investigation and adjudication process so as to increase students' trust in the university's processes.

c.   Incoming transfer, visiting, and graduate students should receive the same training as above, with the exception that the training might occur either prior to the start of classes or within the first two weeks of the academic year.  This training should include the differences between the university's administrative processes and a criminal process (including a clear explanation as to when UMPD involves local law enforcement, and why), as well as an explanation as to the limitations of each.  The training should be mandatory, with consequences (e.g. hold on registration) for those who do not take the training.  Training for graduate students should also include information about signs of harassment, bullying, discrimination and unhealthy relationships/relationship violence, and their reporting obligations when

UM 6965

working with undergraduate students.

d.  Responsible Employee (including supervisorial student workers) Training:  60-90 minute[5] training, for all employees delivered on some regular basis.  Training should be highly practical and explain how to identify issues that might be considered a form of gender-based harm or any other form of protected-class harassment and discrimination; how to appropriately forward information that has been brought to their attention; how to include the student or reporting party in the referral process; appropriate and inappropriate statements to make to a reporting party (i.e., how to avoid shutting down a reporting party, victim-blaming or biased comments, comments diminishing the severity of the reported conduct); information about on and off-campus resources; and an overview of the University's response protocols so that the responsible employee is less likely to transmit inaccurate information.  This training should include the differences between the University's administrative processes and the criminal process, as well as an explanation as to the limitations of each.  In addition, it should be better explained to responsible employees that, for students, making a referral to the EOAA/Title IX office will generally not result in a University investigation unless the student so requests.  The training should also include a brief explanation regarding interim measures that are available, as well as an explanation as to why it is important that EOAA/Title IX be informed of all requests for interim measures.

In addition, it may be helpful to develop and disseminate a "script" that can be used by Responsible Employees in the event that one receives a report of potential harassment or discrimination, including sexual assault or other gender-based harm.  The ability to have a document to review and use serves as a form of "just in time" refresher training.  Some institutions print such a script, along with other critical information (websites, phone numbers, resources) on a brightly colored laminated piece of card stock (the size of a traditional file folder) that can easily be stored in a faculty or staff member's desk, and easily seen and accessed when needed.

e. Investigator and Discrimination Grievance Committee training:  Annual training on the myths sexual assault and relationship violence; bias; cultural competency; relevance of evidence; appropriate and inappropriate uses of impact statements; demeanor evidence and cultural competency; credibility and reliability of

---

[5]  The data does not suggest that the entirety of the training needs to be in one single, 60-90-minute-long session.  Some data on prevention education and culture change suggests that shorter doses of training over the course of a year may be more effective, in that individuals are better able to absorb and retain the information provided.

UM 6966

evidence;  the neurobiology of trauma; due process and fundamental fairness; pattern evidence; an overview of appropriate and inappropriate questions to ask and training in how best to ask potentially sensitive questions; a general overview of the entire University response process; and, a general overview of best practices in investigations (for investigators).

f.  All clinical staff: Ensure that all clinical staff can identify signs of behaviors of concern (sexual assault, relationship violence, stalking) and make appropriate referrals; ensure that all clinical staff have complete understanding of the entire EOAA/Title IX investigation and adjudication processes so that they can provide accurate information to patients; consider enhanced outreach efforts to victims of childhood abuse and who are thus at greater risk of being a victim of sexual assault or relationship violence.  This training should include the differences between the University's administrative processes and the criminal process, as well as an explanation as to the limitations of each.

g.  Student Organizations: The head of every student organization should have training on how to respond to allegations of harassment, discrimination, sexual harassment, sexual assault, relationship violence that is brought to their attention, so that they are in a better position to understand resources available and appropriate steps to take, rather than "just talk to both students" or "kick one of them out."  Such training should be mandatory and tied to use of space or the release of funds.

h.  Training for all deans and department chairs on University expectations when concerns of harassment, discrimination or sexual violence are brought to their attention, including training on resources available to guide faculty to ensure they make clear there is no place for homophobia, transphobia, racism, or misogyny.

i.  All "first responders," and individuals most likely to receive information regarding a potential concern from a student (including coaches, trainers, assistant coaches, advisors, student advocates, including all confidential employees) should be trained on all aspects of the investigation and adjudication processes at the University, so that they are provided the most up-to-date and accurate information to those who have been impacted by discrimination or harassment, including sexual assault.  This training should include the differences between the University's administrative processes and the criminal process, as well as an explanation as to the limitations of each.  This training should also include education on recent changes to the federal guidance for interim measures, as well

as current best practices for interim measures, so that the first responders better understand why each interim protective measure should be considered on a case-by-case basis.

j. Campus Security Advisors (CSA's):  All CSA's should be identified and the list reviewed on a regular basis so that they may receive appropriate CSA training.

k. Bystander Education training for students, staff, and faculty.  This training might be incorporated into some other training topics identified above.  Bystander education should include information on how to identify acts of aggression, harassment, or discrimination that should elicit an intervention; techniques for safe intervention; classroom management techniques for faculty; and specific techniques that faculty and staff can use when a peer engages in harassing behavior.

## PRIORITIZATION LEVEL and SUGGESTIONS FOR IMPLEMENTATION

An assessment of current training programs should begin right away, so that a gap analysis can then be conducted between trainings already in place and those listed above, along with any other training needs that are identified.

It is recommended that a committee that is advisory to the EOAA/Title IX Coordinator develop an annual plan for all trainings that should be scheduled throughout the year. The committee should also identify trainers[6].  The EOAA/Title IX Coordinator should be charged with ensuring that content accurately states university policies, procedures, and obligations.

To keep in mind:
- When developing training and prevention education content, it is important to ensure that the training is not all heteronormative and/or rooted in one particular culture, and does not suggest that any one group is regularly responsible for harm and that another group is always the target.
- Committee members should include members who are culturally diverse and sensitive to issues of bias and stereotyping.

---

[6] It is noted that SARC is currently charged with providing extensive training, and spends significant time doing so.  Given the need for SARC staff to focus on crisis response and community-building, it is recommended that SARC staff be relieved of their training obligations (or that a dedicated trainer be hired within SARC) so that the staff there can spend more time on outreach, providing support to those impacted by acts of violence, harassment, or discrimination, and crisis response.

- Other considerations that the committee might consider include finding ways to make training and prevention education more accessible and palatable.  For example, frequent but short training messages delivered at the start of a faculty meeting can help keep issues top-of-mind, rather than waiting to reach all faculty for 60 minutes (or longer), particularly as it can be easier to focus on, and retain, shorter messages because some attendees of longer training sessions tend to tune out.

## E.  PREVENTION EDUCATION

Prevention efforts are important to help individuals identify inappropriate behaviors in themselves and others, learn what they can and should expect from others around them, change their own behaviors as needed, increase their willingness to intervene, and ultimately change the overall culture in the UM community.  Prevention education should be offered to students, staff, and faculty on an ongoing basis.  Some scholars also note that affinity groups, opportunities to connect with smaller communities, and community-building events can also be considered as part of an overall prevention/culture change effort.

In terms of sexual violence, studies conducted to date have not found any one form of prevention education that directly results in reducing the number of sexual assaults on a campus.  However, multiple studies have identified the positive impact of a comprehensive prevention education program on helping community members develop a greater willingness to intervene.  In addition, certain prevention education methods have been found to be more effective.  For example, using a combination of teaching methods (small educational workshops, large group motivational speakers, social media campaigns, online instruction, interactive theater) has shown better outcomes than using only one modality.  The inclusion of active learning opportunities has also been found to increase effectiveness, as have small boosters of information and the addition of social media campaigns designed to increase community knowledge on a given topic and to provide members of a community directions for changing behaviors.  Although much of this research on the effectiveness of prevention education has focused on sexual violence, the reviewers note that lessons learned from these studies may also be applicable to other forms of harassment or discrimination that is based upon a particular characteristic or rooted in particular beliefs and assumptions of specific individuals or groups of individuals.

Further, the reviewers recommend that prevention efforts for students be tailored to both the life-cycle of the student and their status, with smaller doses of education

UM 6969

delivered more regularly over the span of the student's enrollment at UM rather than relying solely on one long on-line training session delivered just prior to a student's first semester.  As increased doses of training lead to enhanced outcomes, the reviewers recommend that the university develop a full curriculum of prevention programming that can be implemented at different stages, and that differs appropriately and pedagogically for undergraduate students, transfer students, visiting students, and graduate students.  For example, incoming freshmen might not yet be ready to take on some of the nuances of bystander education but might be better equipped for those lessons after spending at least few weeks at the university; similarly, incoming freshmen might not yet be in dating or domestic relationship with others, and so training on healthy relationships and the signs of an abusive relationship should be offered a second time, and in greater depth, later during the student life-cycle.

In addition to training, other forms of prevention include actions such as:

- Increased opportunities for mentorship within smaller, under-represented communities, so that individuals can more easily find "people like themselves" with whom to bond and forge connections.
- Mandatory reporting of acts of protected-class harassment that are not so severe or pervasive as to be a policy violation.  When such conduct is reported to EOAA/Title IX, a record of the allegation is made, even if no further action is required.  This also permits EOAA/Title IX to check to see if the individual accused has engaged in similar behavior in the past, or if the division or department overall has had similar concerns.  Further, having such a record also allows EOAA/Title IX to become aware of patterns, systemic issues, and conduct that is repeated over time, and to collaboratively (with other administrators, as appropriate), fashion a proper response, which may or may not require a full investigation.  Thus, consistently making reports to EOAA/Title IX of "low level" misconduct should be considered a form of prevention, as well as part of a response protocol.
- Training and mentorship for faculty to ensure they have the classroom management skills necessary to better facilitate classroom discussions and manage the classroom when students engage in racist or misogynistic conduct, or hate speech.

## PRIORITIZATION LEVEL and SUGGESTIONS FOR IMPLEMENTATION

Much of this work is dependent upon first having data to use as the basis for informing decisions about prevention efforts.  Therefore, identifying definitive prevention education efforts will need to take place after other steps regarding routine data collection  (as outlined above) have been implemented.

The same committee working on gathering and analyzing data might also be charged with using that data to determine the prevention efforts that would be appropriate.

## III.  AREAS FOR IMPROVEMENT AND RECOMMENDATIONS

Overall, the University has the components necessary for a compliant Title IX program and the building blocks for a greatly enhanced diversity and inclusion program. However, the University faces certain challenges which, once addressed, will help the university move toward the cultural and community change they seek.

Predominant among these challenges is the lack of resources.  In response to this challenge, extra efforts are being made by staff and faculty to serve on committees and do the work that would otherwise be performed by staff and administrators hired specifically to do that work.  The second challenge is the lack of coordination and accountability that flows from the current structure of that relies upon the voluntary efforts of individual committees to fill these needs.

The University has dedicated professionals working to create a safer and more inclusive environment for students, staff, and faculty.  In addition, numerous staff and faculty serve on committees; the work performed by many of these committees is invaluable given that the university is resource-challenged and currently unable to hire individual staff to perform much of the work done by these committees.

At the same time, the authority of these committees is limited, and a committee-reliant structure also makes it more difficult to assess, and ensure, accountability.  For this reason, it is recommended that the University clearly identify those individuals, departments, or committees charged with specific tasks designed to maintain a safer and more diverse campus, and each assignment should include a clearly articulated goal and a timeline.

To ensure both coordination and accountability, it is recommended that all offices and committees engaged in these and other diversity and inclusion efforts University-wide provide to the University a report identifying goals, steps taken, and progress made.  In the absence of a Vice President for Equity and Inclusion (or similar position), it is recommended that the reports be provided to a small group of administrators from EOAA/Title IX, HR, Student Affairs, and the Office of the Provost who can then compile

UM 6971

that information into a single report for the President.  In the interests of both transparency and accountability, that report, as well as any timelines and action steps resulting from that report, should be shared with the community.

In taking into account all of the requirements and suggestions listed above, the following action steps are recommended:

- Increased advertising of the broad role of SARC in addressing all forms of harassment.
- Update annually the Affirmative Action Plan (AAP).
- Implement the Affirmative Action Plan.
- Conduct exit interviews with faculty and staff who leave UM and then study the results of those exit interviews in order to understand the factors influencing their departure from the University.
- Establish a mentor program for new faculty hires to be paired with established, senior members of the faculty to facilitate their entrance to the UM community and expose them to teaching and research resources at the University.
- Use the results of faculty research to inform the steps UM should take to improve in the areas of inclusion and diversity.
- Establish a process and procedure for conducting hiring searches for new faculty and staff.  Some information that might be included:
  - tips for how to start a productive search
  - how to craft a position description that doesn't inadvertently deter highly qualified applicants
  - outline a search plan based on the position description
  - develop a search committee that includes individuals from diverse backgrounds and who may have a variety of viewpoints and experiences
  - a requirement that all faculty search plans to be reviewed and approved by the Provost prior to the implementation of any search plan for faculty hire and by the Director of HR prior to the implementation of any search plan for staff
  - suggestions for how to recruit a diverse and qualified group of candidates
  - gathering and reviewing available pool data (nationally and locally)
  - reviewing rosters of peer departments (faculty searches)
  - asking senior or well-known faculty and staff to broadcast the position to their colleagues, networks and communities
  - developing a plan to advertise the position in diverse newsletters, papers, listservs, conferences, meetings, journals, etc.
  - reaching out and ask qualified individuals to apply

UM 6972

- o advertising in publications that target female and minority individuals and those who have served in the military
- o ensuring that postings are accessible for individuals with visual and/or hearing impairments
- o guidance for how to evaluate candidates fairly
- o defining the criteria to be used for evaluation
- o providing training on unconscious and implicit bias and its impact on the hiring process and steps that can be taken to mitigate such bias to individuals who are on search committees and those responsible for hiring
- o guidance for how to develop fair and informative campus visits
- o developing effective and fair interview protocols and questions
- o developing consistent and fair on-campus visits
- Develop an expectation of chairs, deans and the Provost's office to intervene, stop and address situations and behavior involving faculty that is harassing or discriminatory or that falls short of UM values even if the behavior does not appear to violate UM policy.
- Develop an expectation of faculty to intervene, stop and address situations and behavior in the classroom that is harassing, discriminatory or falls short of UM values and falls outside the pedagogy for the class or other academic endeavor.
- Develop a training to be delivered to department chairs, deans and the Provost's office.  Training might include:
  - o Identifying harassment and discrimination in the workplace and in the learning environment;
  - o Guidance and practical how-to advice for how to intervene, stop and address situations when faculty engage in conduct that is harassing, discriminatory, undermining or demeaning of others or otherwise falls short of UM values; and,
  - o Practical steps for how to report and escalate harassing and discriminatory behavior to the Title IX Office and/or HR as appropriate for further handling and action as necessary.
- Develop training for faculty on classroom management and how to appropriately handle and/or counter situations of harassment, discrimination or bullying within the classroom or learning environment.
- Establish monthly meetings between EOAA/Title IX, the Office of the Provost, the Dean of Students, and HR to share data and information on current reports and cases, in order to collaborate on specific cases and incidents as appropriate; and, to identify areas in need of training, monitoring or other action in order to prevent future harassment from occurring.

- Establish twice yearly meeting with EOAA/Title IX, SARC to coordinate efforts related to programming, training and events and to share data and information regarding reports received and handled by EOAA/Title IX and the number of individuals served by SARC and services sought to improve programming and training and policy and procedure changes and development.
- Conduct a study of student retention:
  - Retention rates by class (freshman, sophomore, junior, senior)
  - Retention rates by group (including gender, race/ethnicity, international, and any other groups the University tracks) for which the University has identifying information)
  - Identify factors and obstacles that impede retention
- Conduct a study of student persistence:
  - Persistence rates by class (freshman, sophomore, junior, senior)
  - Persistence rates by group including gender, race/ethnicity, international, and any other groups the University tracks) for which the University has identifying information)
  - Identify factors and obstacles that impede student persistence and progress
- Develop a plan to address the factors and reduce the obstacles that impede retention.
- Develop a plan to address the factors and reduce the obstacles that impede persistence.
- Gather data on demographics, hiring, retention, and numbers/types of completes in order to look for patterns and systemic issues, and then develop methods to address those concerns.
- Develop a University-wide definition of "diversity" and "inclusion."
- Establish minimum standards of activity for departments and units on campus to hire and promote minority staff and faculty.
- Provide funds, resources, and/or privileges in terms of committees and policy development for those departments that take active and ongoing steps to increase diversity and inclusion in their department and/or campus-wide.
- Identify and develop mechanisms for holding accountable those departments and units who either thwart efforts to hire and promote minority staff and faculty or who do not take sufficient action to hire and promote minority staff and faculty including the removal of funds, resources and/or privileges in terms of committees and policy development.
- Provide incentives to inspire a more inclusive learning environment:
  - Incentivize faculty to create or include in their coursework issues of diversity in their fields and to team teach across diverse lines

UM 6974

- o Teach faculty how to address current events and news that touch on discrimination and harassment in their classrooms
- Provide training for faculty on classroom management, confronting hate speech, and practical classroom management skills to confront harassing, bullying and discriminatory behavior and knowledge and skills about how to defuse conflicts but not shut down speech and debate or make the classroom environment intolerant of speech and debate.
- Establish expectations of faculty mentors supporting junior faculty in the tenure review process.
- Establish incentives for senior faculty members to want to mentor a junior faculty member engaged in the tenure process.
- Create and implement a formal third-year review process.
- Review and adjust the current staffing level at SARC relative to students served, and add at least one staff member to provide necessary counseling and support to students who experience harassment and discrimination on campus and to supervise advocates.
- Add a training coordinator to coordinate training and prevention education efforts in support of the University's training requirements and goals.
- Provide a personal coach/mentor (personal and academic tied to retention) to each new freshman.
- Add to the EOAA/Title IX complaint resolution/investigation staff.
- Develop partnerships with local business and civic leaders to foster meaningful opportunities for campus and community engagement that supports and furthers cultural awareness and celebrates the diversity of the UM community.
- Create internship opportunities for underrepresented students.
- Create mentorship opportunities between business and civic leaders and underrepresented students.
- Create symposia, and networking opportunities.