## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| CATHERINE COLE, BARBARA KOOSTRA, MARY-ANN SONTAG BOWMAN, RHONDIE VOORHEES, COURTNEY BABCOCK, LAURA BERKHOUSE, RUTH ANN BURGAD, JANE DOE 1, JENNIFER COOPER, CINDY FERGUSON, FRIEDA HOUSER, SHERRIE LINDBO, JENNIFER MCNULTY, KATHLEEN REEVES, JANE DOE 2, and VIDA WILKINSON, individually and on behalf of all others similarly situated, | **CV-21-88-GF-BMM**<br><br>**ORDER** |
| Plaintiffs, | |
| v. | |
| MONTANA UNIVERSITY SYSTEM, UNIVERSITY OF MONTANA–MISSOULA, and JOHN DOE DEFENDANTS 1-50, Defendants. | |

## INTRODUCTION

Plaintiffs Catherine Cole, Barbara Koostra, Mary-Ann Sontag Bowman, Rhondie Voorhees, Courtney Babcock, Laura Berkhouse, Ruth Ann Burgad, Jennifer Cooper, Cindy Ferguson, Frieda Houser, Sherrie Lindbo, Jennifer McNulty, Kathleen Reeves, Vida Wilkinson, and two Jane Does ("Plaintiffs") filed this action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.

("Title IX") against the Montana University System ("MUS") and the University of Montana ("UM") (collectively "Defendants"). (Doc. 53.) Plaintiffs and Defendants filed competing motions, in support of class certification, and to deny class certification, respectively. (Doc. 36); (Doc. 33.)

## BACKGROUND

Plaintiffs are women suing Defendants for violation of Title IX and breach of the covenant of good faith and fair dealing. Plaintiffs seek to certify the following class:

    A.  persons who were employed by the Defendants at any point since 2013;

    B.  experienced harassment, retaliation, and/or discrimination "on the basis of sex;" and

    C.  the person was:
        i.  forced to resign,
        ii.  the Defendants terminated their position, and/or
        iii.  the Defendants created no, or limited, options for professional growth.

(Doc. 36 at 11.) Plaintiffs allege generally that Defendants discriminated against them on the basis of sex. Plaintiffs claim that Defendants fostered a "good ol' boys club culture, favoring male athletes and employees, while excluding women from participation in activities and benefits regularly afforded to their male counterparts." (Doc. 35 at 9.) For the purpose of demonstrating the types of claims Plaintiffs seek to bring in this class action, the Court will summarize each of Plaintiffs' claims here:

- Plaintiff Catherine Cole ("Cole") served as UM's Vice President of Enrollment Management and Strategic Communication. (Doc. 35 at 13.) Cole claims that UM President Seth Bodnar ("Bodnar") "micromanaged [Cole], continually altered and changed her goals and job duties, set unreasonable expectations, informed her that she was moody, asked her to smile, criticized how she communicated and the tone of her voice, belittled her, and commented about her appearance, including her weight, noting that she could not be the face of UM." (*Id.* at 15.) Cole contends that this disparate treatment forced her to resign. (*Id.*)

- Plaintiff Barbara Koostra ("Koostra") served as the Director of the Montana Museum of Art and Culture. (*Id.* at 15.) Koostra alleges that, despite significant achievement during her tenure, Bodnar and his wife "diminished and devalued" Koostra's professional role. Koostra contends that, after raising concerns about the treatment of the art under her supervision, UM moved Koostra to an office with asbestos contamination and eventually failed to renew her contract. (*Id.* at 18-19.)

- Plaintiff Mary-Ann Sontag Bowman ("Sontag Bowman") works as a tenured associate professor at UM's School of Social Work. (*Id.* at 20.) Sontag Bowman alleges that the UM's leadership encouraged the only male faculty member at the School of Social Work to seek a second 5-year

term as department chair in 2020. (*Id.* at 21.) Sontag Bowman alleges that UM made its preference for the male faculty member clear in an effort to discourage Sontag Bowman from applying. (*Id.*) Sontag Bowman alleges that she would have applied for the position had she been afforded a realistic opportunity for her advancement. (*Id.*) Sontag Bowman claims that she repeatedly has advocated against UM's disparate treatment of women and feels a constant threat of retaliation. (*Id.* at 22-23.)

- Plaintiff Rhondie Vorhees ("Vorhees") served as the Dean of Students. (*Id.* at 23.) Vorhees's role required her to act upon multiple instances where UM failed to comply with Title IX. (*Id.* at 25.) Vorhees claims that her actions to protect students, particularly female students, were met with disproportionate conflict and she was often overridden. (*Id.* at 26-28.) Vorhees claims that UM eliminated the Dean of Students position and terminated her contract in retaliation for her Title IX enforcement. (*Id.* at 28.)

- Plaintiff Courtney Babcock ("Babcock") served as the Head Cross Country and Assistant Track and Field Coach for the men and women teams. (*Id.* at 30.) Babcock alleges that male coaches derided her on the basis of her sex, that her program was improperly underfunded, that her wages were the lowest in the Big Sky Conference, and that her office space was

disproportionately small. (*Id.* at 31-32.) Babcock alleges that UM did not renew her contract after she requested proportionate wages. (*Id.* at 32.)

- Plaintiff Laura Berkhouse ("Berkhouse") worked as an administrative assistant in various UM departments, including the Office of Legal Counsel. (*Id.*) Berkhouse suffered from a physical disability that her physician determined should limit her work to 20 hours per week. (*Id.* at 33.) UM denied Berhkouse's requested accommodation and terminated Berkhouse. (*Id.*) Berkhouse alleges that she was treated differently than her male colleagues by being denied an accommodation and eventually being terminated. (*Id.*)

- Plaintiff Ruth Ann Burgad ("Burgad") works as a Computer Systems Analyst in the UM Information Technology Department. (*Id.* at 34.) Burgad claims that, while her male employees are able to express their opinions, UM has written up Burgad for acting similarly. (*Id.*) Burgad alleges that UM has threatened her with termination for failure to disclose a medical condition, an action Burgad claims to which UM does not subject her male colleagues. (*Id.*) Burgad also claims that UM retaliated against her both for crying at work and for submitting a Title IX report following her supervisor's response to her crying. (*Id.* at 35-36.) Burgad

claims that UM has denied her promotions on the basis of her sex. (*Id.* at 36-37.)

- Jane Doe 1 ("Doe 1") was a student at UM. (*Id.* at 37.) Doe 1 alleges that a male student stalked and harassed her and that she reported the conduct to UM and Missoula Police. (*Id.*) Doe 1 claims that UM failed to take action to separate her and her stalker. (*Id.* at 38.) Doe 1 was in the same academic program as her alleged stalker. (*Id.*) Doe 1 was forced to avoid class and change her academic work to avoid contact with him. (*Id.*) Doe 1 became an undergraduate advisor and administrative associate employed by UM. (*Id.*) Doe 1 claims that she was forced to interact with her alleged stalker while employed by UM. (*Id.* at 39.) Doe 1 claims that UM mishandled her Title IX reports and failed to act upon them, and, as a result, Doe 1 was forced to seek employment elsewhere. (*Id.*)

- Plaintiff Jennifer Cooper ("Cooper") serves as Adjunct Assistant Professor of Flute and Music Theory. (*Id.* at 40.) Cooper alleges that UM cut her workload disproportionately to her male colleagues, such that she lost benefits of employment that her male colleagues did not, despite her male colleagues' possessing proportionately less experience and education. (*Id.* at 40-41.) Cooper claims that the disparate treatment she experienced has forced her to work multiple jobs and change her career. (*Id.* at 41.)

- Plaintiff Cindy Ferguson ("Ferguson") served as a Systems Analyst for UM Enrollment Services. (*Id.* at 42.) Ferguson claims that UM failed to promote her despite a recommendation from her supervisor. (*Id.*) Ferguson claims that UM previously had promoted male employees with less experience. (*Id.*) Ferguson alleges that the environment and culture at UM forced her to retire earlier than she would have planned. (*Id.* at 43.)

- Plaintiff Frieda Houser ("Houser") worked as Director of Fiscal Affairs and Director of Accounting and Budgeting for MUS. (*Id.*) Houser claims that her male supervisor explicitly stated that he trusted male employees and would consult with those male employees rather than Houser. (*Id.* at 44.) Houser alleges that UM terminated her employment because she was not allowed to do her job despite possessing expertise above that of the male employees who were consulted and retained. (*Id.* at 44-45.)

- Plaintiff Sherrie Lindbo ("Lindbo") served as a Financial Manager for MUS. Lindbo claims that women were only able to succeed in her office if they were "young, beautiful, inexperienced, and 'yes' people." (*Id.* at 46.) Lindbo claims that UM retaliated against her for requesting proper paperwork and notifying a Director that state funds were being used for extravagant dinners. (*Id.* at 46-47.) UM failed to renew Lindbo's contract, and she claims that UM filled her position with a man. (*Id.* at 47.)

- Plaintiff Jennifer McNulty ("McNulty") served as a tenured math professor and Interim Dean of the College of Humanities and Science at UM. (*Id.* at 48.) McNulty alleges that she was not invited to meetings, planning sessions, or one-on-one meetings with the President while she served as Interim Dean despite the College of Humanities and Science comprising over half the student body at UM. (*Id.* at 48-49.) McNulty claims that the other Deans, predominantly male, received these opportunities. (*Id.* at 49.) McNulty applied for and was denied the permanent Dean position. (*Id.*) UM chose a male candidate who McNulty alleges had less experience. (*Id.*) This action forced McNulty to leave UM to further her career. (*Id.*)

- Plaintiff Kathleen Reeves ("Reeves") worked as an Administrative Associate for the UM School of Law. (*Id.* at 50.) Reeves claims that her male supervisor treated her disparately by yelling at her and accusing her of having anger issues. (*Id.*) Reeves claims that this treatment forced her to retire earlier than she had planned. (*Id.*)

- Jane Doe 2 ("Doe 2") was a teaching assistant at UM. (*Id.*) Doe 2 was informed by a female student that the student was being harassed and stalked by a male student. (*Id.* at 51.) Doe 2 reported the harassment to the Title IX office. (*Id.*) Doe 2 alleges that the male student then came to Doe 2's lab, grabbed her by the shoulders, and pushed himself against her in a

humping motion. (*Id.*) Doe 2 claims that UM responded by removing Doe 2 from the class and requiring her to teach a class out of her field when she sought assistance from UM. (*Id.* at 52.) Doe 2 alleges that this response was retaliation and that she has been treated disparately since reporting the assault. UM's response caused Doe 2 to alter her educational and career path. (*Id.* at 53.)

- Plaintiff Vida Wilkinson ("Wilkinson") served as Director of Outreach at the Missoula College, UM's 2-year college. (*Id.* at 54.) Wilkinson applied to become Interim Dean of Missoula College. (*Id.*) Wilkinson alleges that, despite being informed that she had been selected, MUS reversed course and chose a less qualified male candidate for the position. (*Id.*) Wilkinson claims that UM's decision forced her to seek other employment to further her career. (*Id.*)

## LEGAL STANDARD

### *Class Certification*

Class relief is appropriate where the underlying issues are common to the entire class and the questions of law are applicable to each class member. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). Class actions serve to save the Court's and the parties' resources by allowing an issue affecting every class member to be economically

litigated. *Id.* Courts limit claims that fall under the class action umbrella to those class claims that are "fairly encompassed by the named plaintiff's claims." *Id.* at 156 (quoting *Gen. Tel. Co. of Northwest v. EEOC*, 446 U.S. 318 (1980)).

Federal Rule of Civil Procedure 23 governs class certification. The party seeking class certification holds the burden of demonstrating that they have met all the requirements of Rule 23(a) and Rule 23(b). *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). To certify a class, Plaintiffs must establish the following elements:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If Plaintiffs meet these four requirements, Plaintiffs must also establish that the class meets one of the following conditions:

(1) prosecuting separate actions by or against individual class members would create a risk of:
  (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
  (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

      corresponding declaratory relief is appropriate respecting the class as a whole; or

(3)   the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b).

## *Title IX*

Title IX prohibits discrimination on the basis of sex by educational institutions receiving federal assistance. 20 U.S.C. § 1681; *Emeldi v. University of Oregon*, 698 F.3d 715, 723-24 (9th Cir. 2012). Courts have recognized three separate theories of discrimination under Title IX: (1) disparate treatment; (2) disparate impact; and (3) retaliation.

In order to establish a prima facie case of disparate treatment a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) similarly situated men were treated more favorably. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).

To make a prima facie case of disparate impact, a plaintiff "must show that a facially neutral employment practice has a significantly discriminatory impact" upon a protected group. *Paige v. California*, 291 F.3d 1141, 1144 (9th Cir. 2002). "This showing consists of two parts: the plaintiff[] must demonstrate 1) a specific employment practice that 2) causes a significant discriminatory impact." *Id.* at 1145.

The plaintiff also must establish that the challenged practice is either (a) not job related or (b) inconsistent with business necessity. 42 U.S.C. § 2000e-2(k)(1)(A)(i).

A prima facie case of Title IX retaliation requires a plaintiff to allege three elements: (1) the plaintiff was "engaged in [a] protected activity;" (2) the plaintiff "suffered an adverse action;" and (3) a "causal link" between the first two elements. *Emeldi*, 698 F.3d at 724 (citing *Brown v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003)). Plaintiff must adequately plead that "a reasonable [person] would have found the challenged action materially adverse." *Id.* at 726.

## ANALYSIS

## I.    Plaintiffs' proposed class fails to satisfy the requirements of Rule 23(a).

### A.    Numerosity

No bright line rule exists for numerosity, but Courts almost always deny certification of a class where the class contains fewer than 20 putative members. *See, e.g.*, *Gen. Tel. Co. of Northwest v. EEOC*, 446 U.S. 318, 330 (1980). Courts occasionally deny certifications for failure to meet the numerosity requirement when the proposed class stands between 20 and 40 putative members. *See, e.g.*, *Peterson v. Albert M. Bender Co., Inc*., 75 F.R.D. 661, 667 (N.D. Cal. 1977)*; Anderson v. Home Style Stores, Inc*., 58 F.R.D. 125, 130 (E.D. Penn. 1972).

The putative class members are so numerous as to make joinder impracticable here. Plaintiffs have stated that there are a total of 24 women with similar

experiences who directly have contacted Plaintiffs' counsel, 20 women who previously have filed Title IX complaints against Defendants, and 28 additional women who were identified during depositions. (Doc. 36 at 15-17.) In total, Plaintiffs claim to be aware of at least 76 putative class members, including the named Plaintiffs. (*Id.*)

Defendants challenge whether Plaintiffs have demonstrated sufficient evidence to support the 76 putative members. (Doc. 38 at 23-24.) Courts frequently rely upon good-faith estimates for the purpose of determining numerosity at the certification stage. *P.P. v. Compton Unified Sch. Dist.*, 2015 WL 5752770, at *8 (C.D. Cal. Sept. 29, 2015) (citing Newberg on Class Actions, § 3:13 (5th ed. 2011)) ("[A] good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable."). The Court determines that the supporting declarations adequately support Plaintiffs' numerosity claim.

### B.   Commonality

A class meets the commonality requirement through the existence of the "same injury" resulting in a "common contention" that is "capable of class wide resolution [. . .] in one stroke." *Walmart Stores, Inc. v. Dukes* ("*Dukes*"), 564 U.S. 338, 350 (2011). Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982). The U.S. Supreme Court has narrowed this inquiry

significantly. It is no longer sufficient to demonstrate that the putative class members suffered injuries under the same law. *Dukes*, 564 U.S. at 350.

Broad allegations of discrimination prove insufficient, as the U.S. Supreme Court explained in *Dukes*. *Id.* The U.S. Supreme Court stated that, in the context of Title VII, claims may take the form of "intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company." *Id. "*The mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once." *Id.*

Plaintiffs' claims all point to the same cultural infirmity allegedly present within UM and MUS. Plaintiffs' claims appear too disparate, however, to be resolved in one stroke. Plaintiffs have failed to identify an employment practice that ties together the putative class members to satisfy the U.S. Supreme Court's reasoning in *Dukes*. Plaintiffs attempt to bind the class through the overarching allegation of discrimination on the basis of sex. Allegations of sex-based discrimination alone no longer prove sufficient to satisfy Rule 23(a) following *Dukes*. *Id.* at 350.

Plaintiffs list the following common issues of law and fact among the class:

1. whether the "good ol' boys" culture at UM and MUS discriminates against women;

2. whether the discriminatory culture at UM and MUS creates a brick wall for women's careers;

3. whether the discriminatory culture at UM and MUS violates Title IX; and

4. whether UM and MUS breached the covenant of good faith and fair dealing by discriminating against women.

(Doc. 36 at 20.)

Plaintiffs argue that the Ninth Circuit has taken a permissive view of commonality with respect to discrimination claims, such that the common issues presented above are sufficient to satisfy Rule 23(a)(2). *Id.* Plaintiffs point to the Ninth Circuit's decision in *Staton v. Boeing Co.*, 327 F.3d 938, 956 (2008) to uphold a district court's finding of commonality for an admittedly broad class. *Id.* The *Staton* class consisted of over 15,000 African-American salaried and hourly employees who alleged company-wide discriminatory practices. *Id.* at 953. The class consisted of salaried and hourly employees in different positions as well as employees from companies Boeing recently acquired. *Id.* The Ninth Circuit affirmed the district court's finding that commonality existed because the class suffered under "company-wide discriminatory practices." *Id.*

*Staton* would present a favorable comparison for Plaintiffs. Plaintiffs' theory poses a similar type of institutional discrimination claim. The U.S. Supreme Court's 2011 ruling in *Dukes* now constrains *Staton*'s application here. Before *Dukes*, the Ninth Circuit's jurisprudence consistently established that "[t]he existence of shared legal issues with divergent factual predicates is sufficient [to satisfy commonality],

as is a common core of salient facts coupled with disparate legal remedies within the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008) (quoting *Staton*, 327 F.3d at 953); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The U.S. Supreme Court has made clear that commonality now requires both a shared legal theory and the existence of shared facts such that determination of one claim can answer all others. *Dukes*, 564 U.S. at 351-52.

*Dukes* recognized only two mechanisms that Plaintiffs could use to bring a class action alleging broad discriminatory claims: a plaintiff either can (1) show that the employer used a biased testing procedure to evaluate potential employees; or (2) provide "[s]ignificant proof that an employer operated under a general policy of discrimination [. . .] if the discrimination manifested itself in hiring and promotion practices in the same general fashion." *Id.* at 353 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 158, 159 n.15 (1982)). These mechanisms are known as the "*Falcon* bridges." Only the second bridge could apply here.

Plaintiffs have not provided "significant proof" that Defendants acted under a general policy of discrimination. Rule 23 is not a pleading standard. A party seeking class certification affirmatively must demonstrate that "there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 349-50. "[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23," and

must carry their burden of proof "before class certification." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275-76 (2014)). Plaintiffs' allegations of a discriminatory policy are insufficient at this point to certify a class under this merits standard.

The Court notes the uniquely harsh nature of the standard as imposed on a discrimination case. As the Court has stated previously, plaintiffs in discrimination cases rarely unearth "smoking gun evidence" before discovery. *Doe v. Mont. State Univ.*, No. CV-20-23-BU-BMM-JTJ, 2020 WL 7493128, at *6 (D. Mont. Dec. 21, 2020). Discrimination most often arises through "discreet manipulations," usually "hidden under a veil of self-declared innocence." *Id.* at *7. Plaintiffs' allegations, if in fact true, demonstrate a pattern and practice that would bely an unspoken policy or culture acting to the detriment of women employees at UM and MUS. Such a pattern, alone, no longer proves sufficient to establish a class action.

The named Plaintiffs allege a variety of Title IX theories that would require distinct inferences. Compare the allegations of Doe 2, a teaching assistant, with McNulty, the Interim Dean. Doe 2 claims that one of her students sexually assaulted her and that UM retaliated against her for reporting that assault. McNulty alleges that UM excluded her from full participation on the basis of her sex and then did not properly consider her for promotion to the permanent Dean position. Certain

commonalities exist among the claims. Both Plaintiffs allege discrimination on the basis of sex against the same broad employer. Taken together, Plaintiffs' claims allege a sweeping culture of discrimination at Montana's flagship University.

The U.S. Supreme Court in *Dukes* cautioned against focusing on the common questions of law. *Dukes* instead directed district courts to determine "the capacity of a class-wide proceeding to generate common *answers*." *Dukes*, 564 U.S. at 350. Answering whether UM subjected Doe 2 to sex-based discrimination would not provide clarity whether UM subjected McNulty to sex-based discrimination. The two putative class members allege separate theories of Title IX and are disconnected by fact. The same holds true for the entirety of the named Plaintiffs. The injuries alleged require distinct inquiries into each Plaintiffs' circumstances, qualifications, and the alleged discrimination.

On a better record, such variety need not prove fatal to class certification. The various types of adverse employment actions at issue in this case—including, as Defendants point out, Plaintiffs' allegations of hostile working environment, disparate treatment, sexual harassment, and retaliation—could lend themselves to cohesive subsets of injured UM employees. (Doc. 47-1); (Doc. 47 at 13-15.) The named Plaintiffs and the current putative class even appear to include enough members to populate these or similar subclasses. (*See, e.g.*, Doc. 5.)

Rule 23(c)(5) grants the Court broad discretion to divide a class "into

subclasses that are each treated as" a separate class for the purposes of the action. Fed. R. Civ. P. 23(c)(5); *see Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 355 (6th Cir. 2011); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009). Plaintiffs have not yet consolidated the evidence needed to persuade the Court, however, to form any subclasses in this action. Plaintiffs have failed to identify specific facts the Court could use to unite either the actions of Defendants as to each class member or the injuries class members have suffered.

The Court notes that "commonality does not require perfect identity of questions of law or fact among all class members." *Dukes* 564 U.S. at 350. No requirement exists "that every question be common" to the class. *Id.* To the contrary, "even a single common question" of fact or law may suffice to satisfy the commonality requirement, provided all members have suffered from the same adverse conduct. *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014); *Dukes*, 564 U.S. at 376 n.9 (Ginsburg, J., dissenting).

For example, Plaintiffs' Complaint and Motion for Class Certification both allege that the "culture of discrimination" trickled down from the top. Plaintiffs generally have alleged that UM President Bodnar and upper-level employees fostered and perpetuated this "ol boys club" culture. (*See, e.g.*, Doc. 5 at ¶ 33-36). Plaintiffs even claim that "[a]cting through . . . other leaders, UM [and UM's legal counsel] made decisions, took actions, and guided and/or advised senior

administrators, including the President towards decisions that put the safety of the campus, students, and community members, *especially women*, at risk." (Doc. 5 at ¶ 121) (emphasis added). Courts have used such top-down evidence to find commonality in cases challenging discretionary employment decisions where "upper-level, top-management personnel" uniformly exercise such discretion, even after *Dukes* narrowed the field for discrimination-based class certification. *See Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 114 (4th Cir. 2013); *see also Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of Chicago*, 797 F.3d 426, 438 (7th Cir. 2015); *Moussouris v. Microsoft Corp.*, 2018 WL 3328418, at *17 (W.D. Wash. June 25, 2018).

Courts have recognized that "discretionary authority exercised by high-level . . . decision-makers" generally applies "to a broad segment of the corporation's employees." *Scott*, 733 F.3d at 114. This type of broadly applied discretion by senior management would be "more likely to satisfy the commonality requirement." *Id.* The general allegations in the Complaint indicate that Plaintiffs may be able to provide specific evidence to demonstrate how President Bodnar, UM, and its legal department guided "senior administrators . . . toward decisions that put the safety of . . . women at risk." (Doc. 5 at ¶ 121.) Plaintiffs could investigate the allegedly hierarchical organization of UM and MUS departments and consolidate evidence regarding decisions by upper-level management to force out, pass over for

promotion, or fail to renew the contracts of the various class members. Plaintiffs have failed to develop this information to this point.

With regard to retaliation, Plaintiffs have alleged that a "retaliatory culture blossomed" at UM, thereby "creating significant risk of punishment for female professionals expressing challenging or dissenting statements." (Doc. 5 at ¶ 34-40) Plaintiffs also specifically have accused Defendants of retaliation. Plaintiffs alleged that, "like the putative class members, all Plaintiffs experienced direct retaliation or the fear of retaliation for speaking out against Defendants' discriminatory conduct." (Doc. 39 at 23.) Plaintiffs have asserted that "upon information and belief, this discriminatory and retaliatory behavior continues today because female employees continue to fear retaliation and loss of their economic security by speaking out in the lawsuit." (Doc. 5 at ¶ 42.) Finally, Plaintiffs have alleged that "if a female employee acted as a whistleblower, UM retaliated against her. A culture of punishment persists." (*Id.* at ¶ 45.)

Plaintiffs arguably have alleged retaliatory actions that have a potential classwide effect in making these claims. The named Plaintiffs and the putative class of employees work in different departments and suffered different adverse actions. These adverse actions include termination, losing contract renewals, or being passed over for promotion, among others. These allegations could raise the question whether Defendants' conduct as to one group of employees had the effect of broadly

dissuading other women from raising the issue of Title IX or sex discrimination, out of a fear that Defendants would retaliate against them. *See, e.g.*, *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 841 (9th Cir. 2022).

The diversity of class members' positions and other experiences would not necessarily bar the indirect victims from accessing classwide relief had Plaintiffs presented significant evidence that *any* of the alleged retaliation has a deterrent effect on women employees more generally. *See id.* Any Title IX retaliation claims likely would rest upon Defendants' underlying motivation for taking any allegedly punitive action in response to receiving Plaintiffs' discrimination complaints. UM's alleged motive in choosing to retaliate against class members could raise a common question whose answer would "resolve an issue that is central to the validity of each one of the [retaliation] claims." *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)*; A. B.*, 30 F.4th at 841. Plaintiffs have not provided the Court, however, with sufficient specific information in the form of affidavits, declarations, or other evidence to reach this result.

Accordingly, the Court remains constrained by the current record and the narrow reasoning set out by the U.S. Supreme Court in *Dukes*. The Court reluctantly reaches this conclusion even where, as here, a class action mechanism would more expediently deal with individual inquiries. In summary, based upon the evidence now before it, the Court has determined that the injuries alleged by Plaintiffs remain

incapable of resolution "in one stroke." *Dukes*, 564 U.S. at 350. Plaintiffs fail to establish commonality under the U.S. Supreme Court's most recent standard, and, thus, the motion for class certification must be denied at this stage.

The Court's analysis need go no further, but the Court will analyze the remaining Rule 23 factors to expedite any appeal of this decision.

### C.    Typicality

Representative claims are "typical" if the claims of the putative class are expected to be "reasonably coextensive with those of absent class members," though they "need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). The U.S. Supreme Court has noted previously that in discrimination cases, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982). The Court determines that the typicality inquiry proves stronger in Plaintiffs' favor given the diversity of the named Plaintiffs' experiences at UM or MUS. The Court relies on its earlier analysis, however, in determining that the unnamed Plaintiffs' claims would suffer from the same lack of common questions as the named Plaintiffs, and, therefore, would fail to meet the typicality requirement.

### D.    Adequacy of Representation

Under Rule 23(a)(4), Plaintiffs must fairly and adequately protect class interests. Fed. R. Civ. P. 23(a)(4). This inquiry presents a two-fold test: first, "the

named representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). And second, the Court must determine whether the named plaintiffs and counsel will litigate vigorously on behalf of the entire class. *Ellis v. Costco Wholesale Corp.*, 657 F. 3d 970, 985 (9th Cir. 2011).

Defendants argue that the named Plaintiffs have conflicts with prospective members of the class. Defendants cite to depositions where named Plaintiffs discussed members of UM staff that they claim discriminated against Plaintiffs. (Doc. 38 at 25.) Defendants claim that those staff also would be members of the proposed class based on the Plaintiffs' broad definition. (*Id.*)

The Court determines that Plaintiffs would not have conflicting interests with the unnamed members of the class. Supervisory and non-supervisory employees may comprise the same class. *See Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 169 (N.D. Cal. 2004); *Staton v. Boeing Co.*, 327 F.3d 938, 953 (2008). Plaintiffs present a strong argument that all women stand to benefit from ensuring a non-discriminatory culture at UM and MUS. Individual predilections to support UM or MUS by potential class members would not cause a substantive conflict with the representative class members.

## II.    Plaintiffs' proposed class fails to satisfy the requirements of Rule 23(b).

### A.    Rule 23(b)(2)

Rule 23(b)(2) applies when the opposing party either has acted or refused to act on grounds that apply to the entire class such that injunctive relief or declaratory relief is appropriate for the whole class. Fed. R. Civ. P. 23(b)(2). A Rule 23(b)(2) class does not allow members the chance to opt out and does not require a district court to afford potential members notice of the action. *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).

Defendants argue that Plaintiffs do not comply with Rule 23(b)(2) because Plaintiffs seek individualized monetary damages rather than injunctive relief. The Court agrees. No effective form of injunctive relief could be imposed by the Court that would be common to all members of the class. Plaintiffs seek injunctive relief either to enforce monetary damages, which would not satisfy the 23(b)(2) requirement, or "to cease these discriminatory practices and to implement procedures and policies to ensure that these discriminatory practices do not occur in the future." (Doc. 1 at 31.)

The Court cannot fashion such a remedy compliant with Rule 65(d)(1)'s requirement to state the specific acts to be restrained. Fed. R. Civ. P 65(d)(1). Plaintiffs seek a change in the culture at UM and MUS. Such a change may, in fact, be laudable. The U.S. Supreme Court has explained, however, that Rule 65(d)'s specificity requirement reflects "the seriousness of the consequences which may flow from a violation of an injunctive order" and provides notice of the specific

conduct that an injunction proscribes. *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 897 (5th Cir. 1978) (citing *Pasadena City Bd of Ed. v. Spangler*, 427 U.S. 424, 438-39 (1976)). For these reasons, an injunction must contain "an operative command capable of enforcement." *Burton v. City of Belle Glade,* 178 F.3d 1175, 1200-01 (11th Cir. 1999). General "obey the law" orders do not meet this standard. *Payne*, 565 F.2d at 898. The Court cannot effectuate Plaintiffs' desired policy other than to broadly require that UM and MUS "obey the law" by complying with Title IX. The law disfavors such an injunction. *See, e.g.*, *Cuviello v. City of Oakland*, 2009 WL 734676 at *3 (N.D. Cal. Mar. 19, 2009) (citing *Payne*, 565 F.2d at 897-98).

### B.    Rule 23(b)(3)

Federal Rule of Civil Procedure 23(b)(3) requires a district court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). A Rule 23(b)(3) class is not a mandatory class, and putative class members can opt out after receiving notice. *Ellis v. Costco Wholesale Corp.*, 657 F. 3d 970, 987 (9th Cir. 2011). Rule 23(b)(3) permits class certification where a class action may not be required but would be more convenient. *Amchem Products, Inc.*, 521 U.S. at 615. Predominance and superiority allow the rule to "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote [. . .] uniformity of decision as to persons similarly situated, without

sacrificing procedural fairness or bringing about other undesirable result.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment)).

Rule 23(b)(3) calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). A common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* The requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a) in the following manner: plaintiffs must prove that there are "questions of law or fact common to class members" that can be determined in one stroke. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022).

As discussed above, the common, aggregation-enabling, issues in the case are not more prevalent or important than the non-common, aggregation-defeating, individual issues. Plaintiffs call for separate liability and individual damages proceedings. Individualized inquiries would predominate both the liability and damages proceedings. Plaintiffs have failed to demonstrate that Defendants' liability "is subject to common proof." *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 662 (9th Cir. 2022).

The Ninth Circuit in *Bowerman* reversed class certification where plaintiffs sought overtime pay and all claimed to have been misclassified as contractors rather than employees. *Id.* at 657. The Ninth Circuit did not need to determine whether common evidence could prove that the defendant had a uniform policy of misclassifying its vendors. *Id.* at 662. The Ninth Circuit instead reasoned that liability to any class member for failing to pay them overtime wages or to reimburse their business expenses would "implicate highly individualized inquiries on whether that particular class member ever worked overtime or ever incurred any 'necessary' business expenses." *Id.* Where the question is not the amount of damages, but whether liability should be imposed at all, Rule 23(b)(3) is not met. *See id.* (quoting *Castillo v. Bank of America, NA*, 980 F.3d 723 (9th Cir. 2020)).

The Court determines that Plaintiffs would be unable to demonstrate damages "'capable of measurement on a classwide basis,' in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). Plaintiffs fail to meet the requirements of 23(b)(3), given the blurred distinction between 23(b)(3) and 23(a)(2).

## CONCLUSION

The Court believes it appropriate to permit Plaintiffs "a second bite at the class certification apple," given the importance of the issues in this case and the previously discussed evidentiary difficulties discrimination cases present. *See, e.g.*, *Wall v. Leavitt*, 2007 WL 4239575, *1 (E.D. Cal. Dec. 3, 2007) (citing *Corley v. Entergy Corp.*, 222 F.R.D. 316 (E.D. Tex. 2004)). The Court will deny without prejudice Plaintiffs' Motion for Class Certification.

## ORDER

Accordingly, **IT IS ORDERED** that:

- Defendants' Motion to Deny Class Certification (Doc. 32) is **GRANTED**.

- Plaintiffs' Motion for Class Certification (Doc. 35) is **DENIED WITHOUT PREJUDICE**.

DATED this 3rd day of October, 2022.

_____
Brian Morris, Chief District Judge
United States District Court