Hillary P. Carls
Sherine D. Blackford
BLACKFORD CARLS P.C.
602 W. Lamme Street
Bozeman, MT 59715
406.577.2145
406.219.0256 (fax)
carls@blackfordcarls.com
sherine@blackfordcarls.com

Veronica A. Procter
PROCTER LAW, PLLC
2718 Montana Avenue, Suite 200
Billings, MT 59101
406.294.8915
vp@procterlawfirm.com
*Attorneys for Plaintiffs & Putative Class*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| Catherine Cole, Barbara Koostra, Mary-Ann Sontag Bowman, Rhondie Voorhees, Courtney Babcock, Laura Berkhouse, Ruth Ann Burgad, Jane Doe 1, Jennifer Cooper, Cindy Ferguson, Frieda Houser, Sherrie Lindbo, Jennifer McNulty, ~~Kathleen Reeves,~~ Jane Doe 2, Vida Wilkinson, ~~Jackie Hedtke,~~ and ~~Laura John~~Vandi Theriot, individually and on behalf of all others similarly situated, | CV-21-88-M-BMM<br><br>**~~Third~~Fourth Amended Complaint, Request for Class Certification, & Jury Trial Demand** |
| Plaintiffs, | |
| vs. | |
| Montana University System, University of Montana-Missoula, and John Doe Defendants 1-50, | |

1

_____Defendants._____|

Plaintiffs, Catherine Cole, Barbara Koostra, Mary-Ann Sontag Bowman, Rhondie Voorhees, Courtney Babcock, Laura Berkhouse, Ruth Ann Burgad, Jane Doe 1, Jennifer Cooper, Cindy Ferguson, Frieda Houser, Sherrie Lindbo, Jennifer McNulty, ~~Kathleen Reeves,~~ Jane Doe 2, Vida Wilkinson, ~~Jackie Hedtke,~~ and ~~Laura John~~Vandi Theriot, individually and on behalf of all others similarly situated, by and through their counsel of record, Hillary P. Carls and Sherine D. Blackford of Blackford Carls P.C., and Veronica A. Procter of Procter Law, PLLC, pursuant to ~~the Amended Scheduling Order (Doc. 64 at 2), and~~ Federal Rule of Civil Procedure 15, Federal Rule of Civil Procedure 16, and this Court's Order (Doc. 103), file their ~~Third~~Fourth Amended Complaint, Request for Class Certification, & Jury Trial Demand, requests that this action be certified as a class action under Federal Rule of Civil Procedure 23, and complains and alleges as follows.

## **Introduction**

1.     In response to pervasive discrimination against women, in 1972, the United States took a monumental step forward to achieving gender equality in our educational institutions with President Nixon signing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX"). This visionary law provides:

> No person in the United States shall, *on the basis of sex*, be
> excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or
activity receiving Federal financial assistance … .

20 U.S.C. § 1681 (emphasis added).

2.     University of Montana-Missoula ("UM") has long fostered and encouraged a

culture, and the resulting actions, that "on the basis of sex" denied female

employees the benefits of their long dedication to UM's educational programs. UM

did not create a glass ceiling for these women's careers. UM created a brick wall

for these women's careers.

## **Parties**

3.     At all times relevant hereto, Plaintiff Catherine Cole was a resident of

Missoula, Montana and employed by UM.  Ms. Cole currently lives in Michigan.

4.     At all times relevant hereto, Plaintiff Barbara Koostra was a resident of

Missoula, Montana and employed by UM. Ms. Koostra currently lives in Oregon.

5.     At all times relevant hereto, Plaintiff Mary-Ann Sontag Bowman was a

resident of Stevensville, Montana and employed by UM. Dr. Sontag Bowman

currently lives in Stevensville and is still employed by UM.

6.     At all times relevant hereto, Plaintiff Rhondie Voorhees was a resident of

Missoula, Montana and employed by UM.  Dr. Voorhees currently lives in

Arizona.

7.     At all times relevant hereto, Plaintiff Courtney Babcock was a resident of Missoula, Montana and employed by UM.  Ms. Babcock currently lives in Missoula.

8.     At all times relevant hereto, Plaintiff Laura Berkhouse was a resident of Stevensville, Montana and employed by UM.  Ms. Berkhouse currently lives in Corvallis.

9.     At all times relevant hereto, Plaintiff Ruth Ann Burgad was a resident of Missoula, Montana and employed by UM.  Ms. Burgad currently lives in Missoula.

10.     At all times relevant hereto, Plaintiff Jane Doe 1 was a resident of Missoula, Montana and was a student at and employed by UM.  Jane Doe 1 currently lives outside of the United States.

11.     At all times relevant hereto, Plaintiff Jennifer Cooper was a resident of Missoula, Montana and employed by UM.  Dr. Cooper currently lives Missoula and is still employed by UM.

12.     At all times relevant hereto, Plaintiff Cindy Ferguson was a resident of Florence, Montana and employed by UM.  Ms. Ferguson currently lives in Florence.

13.     At all times relevant hereto, Plaintiff Frieda Houser was a resident of Clancy, Montana and employed by the Office of the Commissioner of Higher

Education ("OCHE"), which operates the Montana University System ("MUS").
Ms. Houser currently lives in Clancy.

14.     At all times relevant hereto, Plaintiff Sherrie Lindbo was a resident of
Helena, Montana and employed by OCHE, which operates MUS.  Ms. Lindbo
currently lives in Helena.

15.     At all times relevant hereto, Plaintiff Jennifer McNulty was a resident of
Missoula, Montana and employed by UM.  Dr. McNulty currently lives in Alaska.

16.     At all times relevant hereto, Plaintiff Kathleen Reeves was a resident of
Missoula, Montana and employed by UM.  Ms. Reeves currently lives in Missoula.

17.16. At all times relevant hereto, Plaintiff Jane Doe 2 was a resident of Missoula,
Montana and a student at and employed by UM.  Jane Doe 2 currently lives in
Pennsylvania.

18.17. At all times relevant hereto, Plaintiff Vida Wilkinson was a resident of
Missoula, Montana and employed by UM.  Dr. Wilkinson currently lives in South
Carolina.

19.     At all times relevant hereto, Plaintiff Jackie Hedtke was a resident of
Missoula, Montana and employed by UM.  Ms. Hedtke currently lives in Lolo.

20.18. At all times relevant hereto, Plaintiff Laura John was a resident of Missoula,
Montana and was a student at and employed by UM.  Ms. John currently lives in
Oregon. At all times relevant hereto, Plaintiff Vandi Theriot was a resident of

Missoula, Montana, who applied for and was offered employment by UM.  Ms. Theriot currently lives in Missoula.

21.19. At all times relevant hereto, Defendant MUS is a Montana governmental agency, which operates the State of Montana's public post-secondary educational institutions through the universities and community colleges. The Board of Regents of Higher Education and the Commissioner of Higher Education "supervise, coordinate, manage and control" MUS, as outlined in Article X, Section 9 of the Montana Constitution, which explains:

> (2) (a) The government and control of the Montana university system is vested in a board of regents of higher education which shall have full power, responsibility, and authority to supervise, coordinate, manage and control the Montana university system and shall supervise and coordinate other public educational institutions assigned by law. …
> (c) The board shall appoint a commissioner of higher education and prescribe his term and duties.

22.20. At all times relevant hereto, Defendant UM is a public higher education institution, which operates in Missoula, Montana.  Defendant UM is the flagship campus of the University of Montana campuses.  UM maintains undergraduate, graduate, and professional courses of studies, and employs thousands of persons.

23.21. MUS manages and supervises UM as one of the universities under MUS's authority.

24.22. Defendants MUS and UM receive federal funds within the meaning of Title IX, 20 U.S.C. § 1681, *et seq*.

6

25.23. Plaintiffs believe that the John Doe Defendants are subject to the jurisdiction of the State of Montana and this Court.  John Doe Defendants are parties that may have been involved in the occurrences set out herein, may have been agents of, employers of, employees of, franchisers or franchisees of, or contractually obligated to the named Defendants or are in privy with the named Defendants and, therefore, said John Doe Defendants may have committed one or more of the acts set out herein or may be responsible through tortuous interference, strict liability, breach of warranty, negligence, negligent misrepresentation, the law of agency, respondeat superior, franchise law or by contract for the acts of the named Defendants as set out herein.  Plaintiffs believe and therefore allege that the John Doe Defendants may have committed one or more of the acts set out herein and that they would therefore be liable for the same.  Plaintiffs will amend these pleadings as the case progresses to specify the various acts of the John Doe Defendants.

## **Venue & Jurisdiction**

26.24. The events that are the basis of Plaintiffs' claims occurred in Missoula and Helena, Montana.

27.25. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1343.

28.26. Plaintiffs bring this action to redress a discriminatory and hostile educational environment pursuant to Title IX, and Montana state law claims, as more fully alleged herein.

29.27. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' state law claims because they "form part of the same case or controversy…."

30.28. The amount in controversy exceeds the minimum jurisdictional limits of this Court exclusive of interest and costs.

31.29. Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2) and Local Rule of Procedure 3.2.

\\\  \\\  \\\

### **Facts**

32.30. Title IX governs the Defendants' culture, actions, and policies related to gender because they receive federal funding.

33.31. At all times relevant hereto, UM had adopted policies and procedures to implement requirements of Title IX.  *See, e.g.,* Discrimination, Harassment, and Retaliation Policy, Policy Number 737, Implementation Date August 14, 2020, Responsible Office Equal Opportunity and Title IX (available at https://www.umt.edu/eo/_docs/policy.pdf); Discrimination Grievance Procedures Accompanying the Discrimination, Harassment, and Retaliation Policy, University

of Montana, Office of Equal Opportunity & Title IX (available at

https://www.umt.edu/eo/_docs/discrimination-procedures.pdf).

34.32. MUS further directed OCHE to comply with "state and federal guidelines"

regarding non-discrimination practices.  *See* Montana Board of Regents of Higher

Education, Policy and Procedures Manual, Policy 703 – Non-discrimination,

Montana University System (Effective: June 7, 1976; Revised: July 15, 2013)

(available at https://www.mus.edu/borpol/bor700/703.pdf).

35.33. UM historically has been the flagship institution of the Montana University

System, and for many years UM had the highest enrollment among the universities

in the State.  UM maintained a favorable reputation for its Business, Fine Arts, and

Sciences programs, and other professional programs, including the School of

Pharmacy and School of Law.

36.34. UM athletics, particularly the men's football program, was a long-standing

source of pride for students, alumni, and Montanans.  UM athletics fostered not

only a source of income for UM, but attracted many persons to UM, including

students, employees, alumni, and community members.

37.35. While these were some of the positive qualities of UM, it also fostered a

"good ol' boys club" culture, favoring male athletes and employees, while

excluding women from participation in activities and benefits regularly afforded to

their male counterparts.

38.36. In September 2010, MUS appointed Royce Engstrom as UM President.

39.37. Late 2011 started a dark and difficult period for UM, with the well-known sexual assault scandals and resulting U.S. Department of Justice's and Department of Education's investigations into UM for its handling of sexual assaults on campus and violating Title IX.

40.38. Ultimately, these investigations determined that UM:

    a.    violated Title IX, and

    b.    "did not take sufficient effective action to fully eliminate a sexually hostile environment, prevent its recurrence, and address its effects."

Letter from U.S. Department of Justice, Civil Rights Division and U.S. Department of Education, Office for Civil Rights to The University of Montana at 7 (May 9, 2013).

41.39. The scandals also led to Jon Krakauer publishing his best-selling book: "Missoula: Rape and the Justice System in a College Town."

42.40. The sexual assault scandals generated fierce public sentiment.  Since 2011, UM's enrollment suffered historic declines, while Montana State University-Bozeman's enrollment has grown, exceeding UM's total enrollment by nearly double.

43.41.After this difficult period, President Engstrom's tenure at UM ended on December 31, 2016.  UM began its search for a new president to lead it out of this arduous time of decline, hoping to regain UM's former glory.

44.42.In 2017, MUS appointed Seth Bodnar as President of UM.  President Bodnar was the non-conventional candidate without a doctoral degree or employment in higher education administration.  Instead, he had corporate and military experience, working as a former senior executive at the General Electric Company ("GE") following his graduation from West Point and his decorated military career.

45.43.Like UM, GE suffered from a precipitous decline, a federal administrative investigation, and performance shortfalls.  GE also had its own pervasive issue with gender discrimination, fostering patterns and actions that favored and promoted male employees to the detriment of women. *See, e.g., Schaefer v. General Elec. Co.,* 2008 WL 649189 (D. Conn. 2008) (settled outside of court for a confidential amount).

46.44.President Bodnar's other prior experience was with the military, an institution long plagued with gender discrimination.

47.45.As UM suffered the consequences of its unequal treatment of women, President Bodnar took the reins.  Yet, President Bodnar's prior experience was

exclusively with institutions who had their own troubled past with gender discrimination.

48.46. For professional women at UM, their already limited paths to professional success soon narrowed.

49.47. Under President Bodnar's leadership and in violation of UM's policies and federal law, youth, perceived attractiveness, and/or fitness were relevant factors for women navigating a successful path. It was well known that under President Bodnar, the careers of the athletic-built women thrived, while older, less attractive women were publicly critiqued.

50.48. Under President Bodnar's leadership and in violation of UM's policies and federal law, a retaliatory culture blossomed, creating significant risk of punishment for female professionals expressing challenging or dissenting statements.

51.49. Under President Bodnar's leadership and in violation of UM's policies and federal law, UM intimidated women, threatening their careers as the consequence to asking hard questions or making hard statements.

52.50. Under President Bodnar's leadership and in violation of UM's policies and federal law, women's choices and actions were unreasonably contradicted and questioned.

53.51.Under President Bodnar's leadership and in violation of UM's policies and federal law, while men at UM had the opportunity to lead, contribute, and have long careers at UM, women did not.

54.52.Ignoring the need to reevaluate its actions and the resulting treatment of women, UM's discriminatory culture persisted, creating a career-brick-wall for experienced, confident women.

55.53.MUS furthered and implicitly encouraged UM's discriminatory culture and behavior, with MUS's own failure to comply with its policies and federal law, terminating experienced, competent, and qualified women who challenged the "good ol' boys club."

56.54.Upon information and belief, this discriminatory and retaliatory behavior continues today because female employees continue to fear retaliation and loss of their economic security by speaking out in this lawsuit.

57.55.Defendants have acted with deliberate indifference towards Defendants' treatment of women, which includes failing to timely act to stop behaviors that violate their own policies and federal law.

58.56.Plaintiffs' experiences discussed below are only a few examples of this pervasive culture of male domination and retaliation against experienced (often older) female professionals.

~~59.~~57. Effectively, if a female employee acted as a whistleblower, the Defendants retaliated against her. A culture of punishment persists.

~~60.~~58. As discussed below, the hostile and discriminatory culture and environment at MUS and UM created and continues to create wage, promotion, and opportunity gaps for women.

~~61.~~59. The hostile and discriminatory culture and environment at MUS and UM caused the Plaintiffs to suffer from emotional distress.

### Catherine Cole

~~62.~~60. In July 2018, UM hired Ms. Cole as its Vice President of Enrollment Management and Strategic Communication.

~~63.~~61. Ms. Cole came from the University of North Florida where she served as Assistant Vice President of Enrollment Services and Director of Integrated Marketing and Strategic Communication.  She had more than 25-years of experience in higher education, and successfully increased brand awareness, diversity, and enrollment for the institutions she worked for. When she left the University of North Florida, she had increased enrollment by 44%.  Today, the University of North Florida continues to benefit from Ms. Cole's strategic vision and implementation of infrastructure with enrollment, retention, and graduation rates increasing above 75%.

64.62. When Ms. Cole was hired, she was 50-years-old. Ms. Cole was not an obviously athletic woman.

65.63. Upon information and belief, President Bodnar did not want to hire Ms. Cole, but the hiring committee uniformly selected Ms. Cole as the best candidate.

66.64. At the time, Ms. Cole was the only female Vice President at UM.

67.65. During her employment, Ms. Cole earned a starting salary of $170,000 annually.  UM paid Ms. Cole the lowest salary of its Vice Presidents, despite her exceptional qualifications, work ethic, and results.

68.66. At the time UM hired Ms. Cole, UM had recently created the Vice President of Enrollment Management and Strategic Communication position for the President's cabinet, integrating marketing, communications, and enrollment into one position.

69.67. As a senior executive on the President's cabinet, Ms. Cole's leadership responsibilities included marketing, communications, public relations, UM branding, recruiting students, faculty and staff, and engaging UM alumni, community members, and businesses.

70.68. During her employment with UM, Ms. Cole received countless praise and accolades for her work performance.  Ms. Cole's work was improving the perception of UM and its enrollment.

71.69. Despite Ms. Cole's excellent work, President Bodnar:

a.      micromanaged her,

b.      continually altered and changed her goals and job duties,

c.      set unreasonable expectations,

d.      informed her that she was moody,

e.      asked her to smile,

f.      criticized how she communicated and the tone of her voice,

g.      belittled her, and

h.      commented about her appearance, including her weight, noting that she could not be the face of UM.

~~72.~~70. Despite being a Vice President of UM, Ms. Cole was excluded from meetings with the Board of Regents.

~~73.~~71. Ms. Cole became the only UM cabinet member who was second guessed, interrupted, criticized, and questioned.

~~74.~~72. This unprofessional toxicity and discrimination forced Ms. Cole to resign on July 24, 2020.

~~75.~~73. The working conditions at UM were so difficult for Ms. Cole that she was compelled to, and had no other choice but to, resign.

~~76.~~74. At all times prior to Ms. Cole's resignation, she was an employee in good-standing. She was never the subject of a disciplinary action.  President Bodnar, her supervisor, never poorly reviewed Ms. Cole.

~~77.~~75. After Ms. Cole's forced resignation, Defendants hired two people to replace Ms. Cole.

~~78.~~76. Defendants' actions forced Ms. Cole's career path downward.  To escape UM's discriminatory and toxic environment, Ms. Cole took a $40,000 pay cut and moved away from her family to a smaller university.

~~79.~~77. Defendants further retaliated against Ms. Cole by eventually terminating her husband's position at UM, explaining that the funding for his position had ended. Despite this alleged funding issue, Defendants paid Ms. Cole's husband his salary for the 5-months remaining on his contract after his termination. Upon information and belief, Defendants sought to rehire his position after his termination.

~~80.~~78. As a result of Defendants' mistreatment and discrimination, Ms. Cole has suffered from weight fluctuation, migraines, depression, anxiety, chest pain, vomiting, and increased kidney disease from the stress and dehydration.

~~81.~~79. As a result of Defendants' actions, Ms. Cole has been damaged.

**Barbara Koostra**

~~82.~~80. In January 2005, UM hired Barbara Koostra to be Director of the Montana Museum of Art and Culture ("Museum").

~~83.~~81. Ms. Koostra earned a B.M. at Northwestern University and an M.B.A. at UM. At the time she was hired, Ms. Koostra was previously the Executive Director for the Missoula Cultural Council, Communications Director for the Montana Arts

Council, and Communications Specialist at the National Endowment for the Arts in Washington D.C.

84.82. During her 14-year tenure at the Museum, Ms. Koostra expanded the Museum's permanent collection, doubling the value to approximately $25 million–$30 million, making it one of the most valuable and significant art collections in Montana.

85.83. Ms. Koostra received more attention for the Museum and produced more programming than any previous Director in her position. Under Ms. Koostra's direction, the Museum presented over 60 exhibits, including Monet, Renoir, Rembrandt, Chagall, Picasso, Corot, Diebenkorn, Pulitzer Prize photographers, and other well-known and historic artists.

86.84. She increased the financial viability of the Museum, raising over $1.5 million in operating, building and project funds.

87.85. Ms. Koostra's fundraising efforts and donor relationships allowed her to maintain her salary, despite budget cuts by UM from 2007 to 2009, which eliminated much of the Museum's staffing.

88.86. In 2018, President Bodnar and Interim Provost Paul Kirgis of UM asked Ms. Koostra to decorate the downtown Missoula Marriott with the Museum's permanent collection. Ms. Koostra directly questioned the appropriateness of this request because the public owns the artwork and the Marriott's facilities did not

appear to have the security and climate control requirements necessary to protect the collection.

89.87. In raising her concerns, President Bodnar and Interim Provost Kirgis accused Ms. Koostra of refusing to cooperate.

90.88. Traditionally, Museum art is displayed at the UM President's house and office. Chelsea Bodnar, President Bodnar's wife, directed the President's staff to inappropriately handle and move art in those locations, ignoring the concerns of the Museum staff. This diminished and devalued Ms. Koostra's professional role as the Museum's Director.

91.89. In September 2018, UM moved Ms. Koostra's office to McGill Hall, Room 212.

92.90. She immediately noticed the stuffy, hot, fumy, odorous, and dank conditions in her office.  Concerned with these work conditions, Ms. Koostra notified the "work-order desk" multiple times about the air quality problems. For weeks, despite attempting remedies, UM found no solution. Ultimately, UM vacated McGill Hall due to the extent of the asbestos problem, which it first discovered in Ms. Koostra's office.

93.91. On November 13, 2018, Ms. Koostra emailed Dean Stephen Kalm about the poor work conditions in McGill Hall.  Approximately 2-hours later, the Provost's office contacted Ms. Koostra seeking to schedule a meeting.

94.92. Six-days later, on November 19, 2018, the Provost notified Ms. Koostra that her contract would not be renewed because of budgetary constraints and reorganization.

95.93. At the time of Ms. Koostra's termination she was 62-years-old and nearing the end of her career. She had successfully served as the Museum's Director for 14.5-years. Had Ms. Koostra reached 15-years, she would have been eligible for the Defendants' retirement benefits.

96.94. During Ms. Koostra's employment with UM, she was an employee in good-standing.

97.95. Despite the alleged budgetary concerns, UM ceased Ms. Koostra's work beginning January 1, 2019, but paid her another 6-months through the term of her contract. UM paid her for 6-months during which UM prohibited her from working.

98.96. Ultimately, Ms. Koostra's complaints about the poor working conditions in McGill Hall had merit because UM discovered asbestos in the building. This was an especially important discovery given that McGill Hall housed UM's preschool.

99.97. Despite its claim of reorganization, Defendants replaced Ms. Koostra with a male Museum Director with fewer qualifications and a higher starting salary than Ms. Koostra received when she began in this position.

~~100.~~98.      As a result of Defendants' actions, Ms. Koostra has received medical treatments and therapies.

~~101.~~99.      As a result of Defendants' actions, Ms. Koostra's successful career was cut short.

~~102.~~100.      As a result of Defendants' actions, Ms. Koostra fears for her health due to her asbestos exposure.

~~103.~~101.      As a result of Defendants' actions, Ms. Koostra has been damaged.

### Mary-Ann Sontag Bowman

~~104.~~102.      Dr. Sontag Bowman is a tenured associate professor in UM's School of Social Work.

~~105.~~103.      Dr. Sontag Bowman holds a Ph.D., M.S.W. and B.A. in Social Work from the University of California Berkley.  She is also a Licensed Clinical Social Worker.

~~106.~~104.      Dr. Sontag Bowman has been employed by UM since 2008, and is an employee in good-standing. Dr. Sontag Bowman has never been the subject of a disciplinary action nor received a poor review from her supervisors.

~~107.~~105.      She is currently 63-years-old.

~~108.~~106.      The School of Social Work, like the profession of social work, is dominated by women.

~~109.~~107.      The School of Social Work has more female than male students.

110.108.     Despite the School of Social Work primarily being filled with women, its leadership roles have long been held by men.  Like other programs at UM, UM's "good ol' boys club" mentality permeates into the School of Social Work.

111.109.     In 2020, at the encouragement of UM leadership, the only male faculty member and current chair sought a second 5-year term; effectively, foreclosing female leadership in the School of Social Work for a decade.

112.110.     In response, Dr. Sontag Bowman aptly observed:

> UM has a gender issue in leadership positions, and this email establishes a plan to have that continue in the School of Social Work. The optics and implications of a female faculty being led by a man – and years and years of male leadership in a female-dominated department and profession – are unfortunate.
>
> I find all that disheartening and disappointing – women need not apply is the bottom line.

113.111.     Had UM not discouraged other applicants by selecting its preferred choice, Dr. Sontag Bowman would have applied for this leadership position.

114.112.     After a successful 13-year career, and asset for the School of Social Work, Dr. Sontag Bowman has hit a career-brick-wall. Despite her qualifications, UM discouraged her opportunities for professional growth and leadership, while favoring her male counterparts.

115.113.     As a tenured professor, Dr. Sontag Bowman has repeatedly raised concerns over UM's poor male leadership and discriminatory treatment of women.

116.114.    When she served as Chair of the Faculty Senate, Dr. Sontag Bowman, among other actions:

a.    brought to light President Bodnar's resume inaccuracies shortly after the Defendants hired him, and

b.    challenged, with other faculty leaders, President Bodnar's plan to promote a male to an administrative position without searching for other candidates nor considering a diversity plan.

117.115.    Dr. Sontag Bowman has served as a whistleblower, bravely alerting UM to issues regarding its unequal gendered actions—including the ongoing male leadership in the School of Social Work, and President Bodnar's resume misrepresentations and failure to consider or address gender equity.

118.116.    Dr. Sontag Bowman has acted under the persistent fear of retaliation. She is well-aware of UM's longstanding record of terminating female employees for speaking out, using excuses like budgetary cuts or reorganization to oust them.

119.117.    Dr. Sontag Bowman fears that she will be forever prohibited from achieving leadership positions or other opportunities for professional growth due to UM's pervasive favoritism of men.

120.118.    At times, Dr. Sontag Bowman has been accused of being a bully by male UM employees simply for ensuring proper payment of her salary.

121.119.    Only Dr. Sontag Bowman's tenure protects her employment at UM.

122.120.    If not for her age and gender, Dr. Sontag Bowman would consider leaving UM because she has hit her career ceiling, deprived of the benefits of professional growth offered to her male counterparts, and under the constant threat of retaliation.

123.121.    Before President Bodnar's tenure at UM, Dr. Sontag Bowman did not experience limitations. During President Bodnar's tenure, her career path hit a brick wall.

124.122.    As a result of Defendants' actions, Dr. Sontag Bowman has been damaged.

## **Rhondie Voorhees**

125.123.    In July 2012, UM hired Dr. Voorhees as the Dean of Students.

126.124.    Dr. Voorhees is a Missoula native and graduate of UM.

127.125.    Dr. Voorhees has a Ph.D. in College Student Personnel Administration and Higher Education, M.A. in College Student Personnel, and B.A. in Psychology.

128.126.    She has over 30-years of experience working in higher education.

129.127.    In 2002, Dr. Voorhees served as legislative assistant on Title IX and other issues to Congresswomen Patsy T. Mink in the U.S. House of Representatives.  In 1972, Congresswoman Mink co-wrote Title IX. Dr. Voorhees

assisted Congresswoman Mink in writing her last historical reflection on Title IX, published in the *Congressional Record* on July 17, 2002.[1]

130.128.    As Dean of Students, Dr. Voorhees served as a key member of a team of 14 student affairs offices and directors, including serving as UM's chief student conduct officer, a member of the Behavioral Intervention Team (BIT), a member of the Title IX case review team, and Chair of the Admissions Review Committee.

131.129.    Dr. Voorhees's responsibilities included providing direct support and advocacy for students and families at UM.

132.130.    Dr. Voorhees took her role to ensure the safety and security of the student body very seriously.

133.131.    UM hired Dr. Voorhees while the U.S. Department of Education and Department of Justice investigated the sexual assault scandal at UM.

132.    As a result, UM involved Dr. Voorhees in discussions, policy revisions, and many aspects of UM's response to the U.S. Department of Education and

\\\   \\\   \\\

Department of Justice investigations.  Dr. Voorhees evaluated both past and current student cases.

---

[1] After Congresswoman Mink's death and in her honor, the U.S. Congress passed the "Patsy T. Mink Gender Equity in Education Act of 2016," which seeks to support the full implementation of Title IX.

134.133.     In this role, Dr. Voorhees became aware of many concerning situations and often alerted UM of Title IX violations and safety issues. She made repeated efforts to bring to light many concerns she had regarding student and campus safety, especially for female students and faculty, as well as for her own safety as Dean of Students.

135.134.     Despite the importance of the safety of UM's students and campus, and the need for compliance with Title IX, Dr. Voorhees's reports were often met with conflict, minimized, and/or entirely disregarded.

136.135.     Acting through Lucy France, now UM's Legal Counsel, and other leaders, UM often overrode Dr. Voorhees' decisions to keep the campus safe. Ms. France made decisions, took actions, and guided and/or advised senior administrators, including the President towards decisions that put the safety of the campus, students, and community members, especially women, at risk.  For example:

   a.     In 2012/2013, a female student disclosed to Dr. Voorhees that she had been raped by a male student.  Dr. Voorhees advised the student that she would have the Title IX Coordinator, then Lucy France, call her.  Ms. France responded that the student would need to make a written report and refused to confirm whether Ms. France would call her. Dr. Voorhees challenged Ms. France on this process.

b.      In 2013, Dr. Voorhees received a report that a female student was threatening a male instructor because she was romantically infatuated with him. As Dean of Students, Dr. Voorhees recommended expulsion as a sanction due to the severity of the circumstances. Ms. France advised President Engstrom on this matter, and under Ms. France's advice and guidance, the President overruled Dr. Voorhees' recommendation and reduced the sanction.

c.      In 2014, Dr. Voorhees was notified that a male student had been involved in an incident implicating felony criminal charges, had drug and alcohol addiction issues, and that his behavior was not in control. This student also missed a procedural deadline for his admission.  Given the missed deadline and security and safety concerns, Dr. Voorhees, as Chair of the Admissions Review Committee, denied him admission to UM. Ms. France, now Legal Counsel for UM, intervened and forced Dr. Voorhees to present the student's request to the Admissions Review Committee, who then admitted the student.  Dr. Voorhees was later devastated to learn her concerns about the male student were substantiated because another female student reported that the student had raped her.

d.      In 2015, a previous male student applied for readmission.  This applicant: (i) was a convicted felon recently released from prison; (ii) had a

history of violently threatening female authority figures and harassing

female students and faculty; (iii) had suspected serious mental illness; (iv)

stalked a female faculty member; and (v) threatened to rape and kill another

official and her family.  Ultimately, the Admissions Review Committee

(chaired by Dr. Voorhees) decided they would not hear this case because of

the fear of being involved.  Instead, the Committee developed a strategy to

deny the applicant admission because this student presented a significant

threat to campus, especially to women. Upon appeal, Ms. France and another

administrator overruled the Committee's recommendations.

e.      In 2018, after a suspension, a male student had defamed Dr. Voorhees

and other UM officials online with bizarre behavior and writing.  UM failed

to keep Dr. Voorhees appraised of the dismissal of his complaints.

f.      In 2017 into 2018, Dr. Voorhees, and other UM officials, were

working with a male student with a felony background.  She had suspended

him due to his extreme bullying, aggressive, argumentative, demanding, and

threatening behaviors toward various people and offices across the campus,

especially women.  Dr. Voorhees had issued multiple no contact orders for

women employees and students.  This student repeatedly complained to and

abused Dr. Voorhees online and verbally.  The student was ultimately

incarcerated again and later released. Typical for these matters, Dr.

Voorhees had issued a "no trespass order" prohibiting this student from being at UM. Ms. France requested information regarding the "no trespass order", to which Dr. Voorhees explained that the student was such a threat to campus and herself personally that others advised her to receive a personal order of protection against him.  Shortly after Dr. Voorhees's reply to Ms. France, UM eliminated the Dean of Students position.

137.136.    During her tenure at UM, Dr. Voorhees clearly and repeatedly communicated with UM through human resources and her supervisors her experiences, including her fears of retaliation, and safety and security concerns for the UM community.

138.137.    Dr. Voorhees's efforts to fulfill her obligations under Title IX and to the UM community subjected her to retaliation, culminating in the elimination of her position and employment with UM.

139.138.    Ms. France, exerted her influence over Dr. Voorhees' supervisors in retaliation against Dr. Voorhees for speaking out and doing her job.

140.139.    On August 14, 2018, under the pre-text of reorganizing, UM eliminated the Dean of Students position and terminated Dr. Voorhees's contract. UM immediately placed Dr. Voorhees on administrative leave.

141.140.    Unlike the treatment provided to her male colleagues when leaving a position at UM, after placing Dr. Voorhees on administrative leave, UM

unnecessarily humiliated Dr. Voorhees denying her access to her office, computer, email, and files, forcing her to leave the building, and escorting her to the parking lot.

~~142.~~141.    UM paid Dr. Voorhees for another 10-months, while prohibiting her from working, through June 30, 2019, when her contract term expired.

~~143.~~142.    At this time, Dr. Voorhees was an employee in good standing at UM, with a blemish free record. The Defendants never accused Dr. Voorhees of any wrongdoing.

~~144.~~143.    Despite Dr. Voorhees' dedication to protecting the UM community from dangerous individuals, UM retaliated against Dr. Voorhees for confronting these important issues.

~~145.~~144.    As a result of Defendants' mishandling of Dr. Voorhees's termination, she has been defamed by a student in Arizona and her reputation and career have been forever tarnished.

~~146.~~145.    As a result of Defendants' actions, Dr. Voorhees has been damaged.

**Courtney Babcock**

~~147.~~146.    Ms. Babcock has had a successful running career. She is an eight-time All American from the University of Michigan, former Canadian Record Holder in the 5,000m and 10,000m races, and has raced in the World Championships, Olympics, and multiple National Championships.

148.147.    In 2008, UM recruited and hired Ms. Babcock to be the Head Cross Country and Assistant Track and Field Coach for men and women teams.

149.148.    Ms. Babcock was qualified for her positions at UM.

150.149.    During her tenure at UM, Ms. Babcock:

a.    Led UM's Cross Country team to a Big Sky Championship in 2010;

b.    Had 2 athletes qualify for the NCAA Track and Field Championships;

c.    Was 1 of 3 female coaches in NCAA Track and Field programs coaching a men's team;

d.    Assisted the women's Cross Country team in earning the Top 10 GPA's in the country.

151.150.    During her employment at UM:

a.    Male coaches regularly stated to Ms. Babcock: "You're a woman," followed with additional comments such as: "are you going to start complaining?" or "your opinion doesn't count."  These comments were often accompanied by laughter from other coaches.

b.    The male Head Track and Field Coach allocated money given specifically to the Cross Country team to the entire Track and Field program, without consulting Ms. Babcock, who was the Head Cross Country Coach. When Ms. Babcock learned of and addressed the issue, the Head Track and

Field Coach bullied her into silencing her concerns, under pressure of being a "team player."

c.      UM allocated an inadequate office space to Ms. Babcock, having her share an office with a male assistant coach, who used 70% of the office.

~~152.~~151.      While at UM, Ms. Babcock was the lowest paid coach in the Big Sky Conference.  She repeatedly requested wage increases or opportunities to earn more income.  UM denied her requests.

a.      The first time Ms. Babcock asked for a pay raise, UM responded that she should appreciate what she had.

b.      After the Cross Country team won the Big Sky Conference, Ms. Babcock again asked for a raise, which UM limited to a one-time $1,200 bonus.

c.      After the Women's Cross Country team had the Top 10 highest GPAs in the country, Ms. Babcock again asked for a raise.  Instead of considering the raise, the Assistant Athletic Director told the Head Track and Field Coach about her request.  The Head Track and Field Coach responded by coming to Ms. Babcock's office and yelling how dare she ask for a raise that she did not deserve.

d.      In the 5-years that Ms. Babcock coached at UM, her salary did not

increase, but the male Head Track and Field Coach's wages increased by

$14,000, with no championships or similar accolades.

~~153.~~152.      After Ms. Babcock's repeated requests for increased compensation,

UM chose not to renew her contract.

~~154.~~153.      As a result of the hostile and discriminatory culture and environment

at UM, UM did not renew Ms. Babcock's contract and terminated her employment.

~~155.~~154.      As a result of the Defendants' actions, Ms. Babcock lost wages and

benefits, as well as the opportunity to for career growth.

~~156.~~155.      As a result of Defendants' actions, Ms. Babcock has been damaged.

**Laura Berkhouse**

~~157.~~156.      Ms. Berkhouse worked at UM in various departments as an

administrative assistant for many years.

~~158.~~157.      Ms. Berkhouse was recruited to leave another department to join

UM's Office of Legal Counsel because she had previously worked for an attorney.

At this point, UM considered Ms. Berkhouse an asset, agreeing to Ms. Berkhouse's

requests for a higher hourly rate for changing departments.

~~159.~~158.      Ms. Berkhouse was qualified for her position at UM.

160.159.     For 10-years, Ms. Berkhouse successfully worked in the legal counsel's office with challenging work under a demanding supervising attorney. She received excellent work performance reviews.

161.160.     During this period, Ms. Berkhouse had a physical disability, which UM's Legal Counsel accommodated, limiting her work to 32-hours per week.

162.161.     Upon the Legal Counsel's retirement, UM hired the current Legal Counsel.  Ms. Berkhouse continued to work in this office under her new supervisor.

163.162.     In the summer of 2014, Ms. Berkhouse's disability prompted her treating physician to restrict her work to 20-hours per week.

164.163.     UM denied Ms. Berkhouse's request for an accommodation and required her to work 32-hours per week.

165.164.     Upon information and belief, UM did not deny accommodations to male employees.

166.165.     UM treated Ms. Berkhouse differently than male employees by not only denying her accommodation, but also prematurely ending her career.

167.166.     Shortly after denying her accommodation and after a long successful career at UM, UM eliminated her position and terminated Ms. Berkhouse.

168.167.     Unlike her male colleagues, she was terminated, given 1-day to leave UM's campus, pressured to sign inaccurate termination paperwork indicating that

Ms. Berkhouse had quit her position, which she did not sign because she did not quit, and informed that UM had no other part-time positions for Ms. Berkhouse.

169.168.   After enduring this hostile and discriminatory work environment, Ms. Berkhouse has suffered from depression.

170.169.   UM further forced Ms. Berkhouse into economic insecurity, with the premature loss of her income and benefits.

171.170.   UM stole Ms. Berkhouse's opportunity to rejoice at the conclusion of a long and successful career.  Instead, UM humiliated, shamed, and embarrassed Ms. Berkhouse, forcing her out like a bad employee.

172.171.   As a result of Defendants' actions, Ms. Berkhouse has been damaged.

**Ruth Ann Burgad**

173.172.   Ms. Burgad has been employed by UM as a Computer Systems Analyst since 2008 in the Information Technology Department.  The Information Technology Department at UM is dominated by males.

174.173.   Since 2012, Ms. Burgad has been classified as a System Analyst III.

175.174.   In 1996, Ms. Burgad was a female pioneer when she graduated from the University of Montana with a B.S. in Computer Science, with an emphasis in Business Systems.  Ms. Burgad was an excellent student, graduating at the top of her class with a 4.0 GPA, and receiving awards and recognitions for her academic success.

176.175.      During Ms. Burgad's employment at UM:

    a.      She was recognized with the Outstanding Teamwork Award in 2015.

    b.      She received additional training through the MOR Montana Leaders Program in 2014.

    c.      She was UM Staff Ambassador from 2010 to 2011.

177.176.      Ms. Burgad is qualified for her position at UM.

178.177.      Ms. Burgad is a strong leader in her field, carries the load for her team, and excellently performs her work.

179.178.      Ms. Burgard's male colleagues are freely able to express their opinions.

180.179.      In contrast, when Ms. Burgad has similarly expressed her opinions, she was written up for being "aggressive."

181.180.      Ms. Burgad has been accused of taking things personally by her supervisors, a common accusation made to women, but not to men.

182.181.      Ms. Burgad has been threatened with losing her job for refusing to disclose a medical condition. Her male colleagues do not receive similar threats.

183.182.      Ms. Burgad handled a heavy workload. During a meeting with her supervisor and while explaining the stress of the workload, Ms. Burgad cried.  Her male supervisor got angry with her.  Because of her supervisor's behavior, Ms.

Burgad stopped the meeting and requested that someone else be present when they talked.

~~184.~~183.     Ms. Burgad reported this interaction to the Office of Equal Opportunity (a.k.a. "Title IX office").[2]  Ms. Burgad's supervisor retaliated against her for reporting this meeting to the Office of Equal Opportunity by writing her up for being belligerent and publicly expressing in the office that employees who cry at work should be fired.

~~185.~~184.     The Office of Equal Opportunity failed to properly investigate Ms. Burgad's claim, refusing to interview the relevant witnesses and other victims of the supervisor's harassing behavior.

~~186.~~185.     Since 2012, Ms. Burgad has twice asked for a promotion to the title of programming Software Engineer to accurately reflect her job responsibilities and workload.  She is qualified for the position, and it would include a pay raise.  UM denied Ms. Burgad's requests.

~~187.~~186.     UM has explained that her job classification matches her duties.  Ms. Burgad has requested written confirmation of the job duties for these positions.  UM has refused to provide her with this information.

---

[2] The UM office enforcing Title IX has changed names multiple times during the relevant period discussed in this Complaint.  It is referred to by the name the individual Plaintiff recalls it being at the time or the "Title IX office."

~~188.~~187.    During the time Ms. Burgard sought a change in her title, UM continued to treat her male colleagues differently, elevating multiple men to Software Engineers, including those with less experience and training than Ms. Burgad.

~~189.~~188.    UM has created a brick wall for Ms. Burgad's career.

~~190.~~189.    The working conditions at UM were so difficult for Ms. Burgad that she was compelled to, and had no other choice but to, resign at the end of 2022.

~~191.~~190.    As a result, Ms. Burgad has lost wages, benefits, and the opportunity for career growth.

~~192.~~191.    As a result of Defendants' actions, Ms. Burgad has been damaged.

## Jane Doe 1

~~193.~~192.    Jane Doe 1 was a student at UM in 2006.  While she was a student, another male student stalked and harassed her.

~~194.~~193.    Jane Doe 1 reported the stalking and harassing to the Missoula Police Department and to multiple offices and agencies at UM.

~~195.~~194.    UM issued a campus restraining order for the male student.

~~196.~~195.    The campus restraining order was not uniformly enforced on campus nor communicated to those at UM who could enforce the campus restraining order.

197.196.    Over time, the male student's behavior became more concerning and problematic, despite the campus restraining order prohibiting contact with Jane Doe 1.

198.197.    UM discouraged Jane Doe 1 from seeking a temporary order of protection through the court system.

199.198.    The male student was in the same academic program as Jane Doe 1 and had the same classes as Jane Doe 1.  UM required Jane Doe 1 and the male student to take the same classes to successfully qualify for and complete the academic program.

200.199.    UM took no action to separate Jane Doe 1 from her stalker and harasser, and instead asked her to change her behavior to avoid the male student. As a result, Jane Doe 1 was forced to avoid class, change her academic work, and her grades dropped significantly.

201.200.    UM encouraged Jane Doe 1 to change majors or delay her education, while it admitted the stalker and harasser into her program of choice.

202.201.    Even after this point, the male student's behavior continued to escalate.  Jane Doe 1 learned that he harassed another student.

203.202.    In 2012, Jane Doe 1 reported her experience with the male student to UM's Title IX office, who explained that her case had been mishandled.

204.203.     In 2012, Jane Doe 1 began her employment with UM as an undergraduate advisor and administrative associate.

205.204.     Jane Doe 1 was qualified for her positions at UM.

206.205.     In 2013, Jane Doe 1 attended a work event at UM. The male student also attended the event.

207.206.     Jane Doe 1 shared with her supervisor and co-worker her experience with the male student, so that she could stay safe on campus.

208.207.     Upon information and belief, the UM co-worker shared this confidential information about Jane Doe 1 with another victim of the male student, and inappropriately contacted Jane Doe 1 regarding the male student.

209.208.     In 2015, Jane Doe 1 again followed up with UM's Title IX office, seeking for UM to correct its errors from its mishandling of the reports regarding the male student, which adversely impacted Jane Doe 1's education and employment.

210.209.     Between 2018-2021, UM was unable to find Jane Doe 1's file related to this incident. UM continued to attempt to work with Jane Doe 1 to find a resolution and to correct its failures.  UM did not reach a resolution with Jane Doe 1 or correct its failures.

211.210.     UM took no effective actions to prohibit the male student from impacting and changing Jane Doe 1's educational and professional opportunities at UM.

212.211.     UM favored the male student to the detriment of Jane Doe 1.

213.212.     Despite the reports from Jane Doe 1, UM failed to conduct a proper Title IX investigation related to Jane Doe 1's reports.

214.213.     Despite the reports from Jane Doe 1, UM failed to keep her safe on campus.

215.214.     UM's failures forced Jane Doe 1 to alter her educational and professional paths to avoid her stalker and harasser both as a student and employee at UM.

216.215.     In 2016, UM's hostile and discriminatory culture and environment forced Jane Doe 1 to pursue her employment and education elsewhere and not at UM.

217.216.     As a result of Defendants' actions, Jane Doe 1 has been damaged.

**Jennifer Cooper**

218.217.     Dr. Cooper received her Doctorate in Musical Arts in Flute and Music Theory from the Cincinnati College Conservatory of Music.

219.218.     In 2018, UM selected Dr. Cooper from a national search and hired her as an Adjunct Assistant Professor of Flute and Music Theory.

41

220.219.      Dr. Cooper had ample experience and was qualified for the position.

221.220.      Also in 2018, UM hired two other adjunct male professors in the Music Department.

222.221.      Dr. Cooper had more training and experience than the other two adjunct professors that UM hired.

223.222.      Dr. Cooper was hired as a FTE 1.0.

224.223.      Beginning in 2020, UM reduced Dr. Cooper to a FTE 0.8.  Dr. Cooper's male colleagues remained at a FTE 1.0.

225.224.      In May 2020, Dr. Cooper met with her supervisors who assured her that her Adjunct Assistant Professor position during the next academic year would remain at least at FTE 0.5, which was important for her to retain benefits and retirement.  Her supervisors also discussed increasing her title to Lecturer, which had a higher pay base.

226.225.      In Fall 2020, UM ultimately continued to cut Dr. Cooper's classes and responsibilities, reducing her to a FTE 0.45, which did not qualify her for benefits. UM only cut Dr. Cooper's workload.  Her male colleagues remained at FTE 1.0.

227.226.      UM assigned Dr. Cooper's work to her male colleagues with less experience and education.

228.227.      Through Dr. Cooper's efforts she was ultimately able to return to a FTE 0.8.

229.228.    UM has promoted both male colleagues from adjunct professors in the Music Department to Lecturers and kept them at FTE 1.0.  In contrast, Dr. Cooper, who has more experience, training, and majors in the flute program when compared to the cello program, has been effectively demoted.

230.229.    UM allowed her male colleagues to teach secondary lessons to the Music Education majors, but prohibited Dr. Cooper from teaching these students.

231.230.    UM offered her male colleague extra classes to fill his workload, but did not offer Dr. Cooper this same opportunity.

232.231.    UM treated Dr. Cooper's male colleagues favorably, to the detriment of Dr. Cooper.

233.232.    Dr. Cooper was treated differently than her male colleagues with less pay and professional opportunity.

234.233.    As a result of the Defendants' actions, Dr. Cooper has lost income and benefits.

235.234.    As a result of the Defendants' actions, Dr. Cooper works multiple jobs and has changed her professional path.

236.235.    As a result of the Defendants' actions, Dr. Cooper has been damaged.

## Cindy Ferguson

237.236.    Ms. Ferguson worked in Enrollment Services, as a Systems Analyst III, a position she held for 25 years.

238.237.      Ms. Ferguson was qualified for her position at UM.

239.238.      This department was the team charged with improving UM's

enrollment numbers. Under the leadership of Ms. Cole, Ms. Ferguson and their

team were successfully increasing student enrollment.

240.239.      Ms. Cole requested Ms. Ferguson be elevated from System Analyst III

to a "Director" and/or "Developer" position to accurately reflect her duties and

responsibilities for UM.  This would also increase her pay.

241.240.      UM refused to promote Ms. Ferguson.

242.241.      UM had previously promoted male employees with less experience

instead of Ms. Ferguson.

243.242.      While Ms. Ferguson worked for UM, the President's wife requested

data that fell within the Family Educational Rights and Privacy Act ("FERPA"), 20

U.S.C. § 1232g; 34 CFR Part 99. Ms. Ferguson recognized this data could not be

produced because the President's wife was not an employee of UM and refused to

provide this data to her. As a result, the President's wife worked around Ms.

Ferguson, prohibiting Ms. Ferguson from doing her job.

244.243.      UM retaliated against and created a hostile and discriminatory work

environment for Ms. Ferguson by failing to promote her, adequately pay her, and

creating culture where it was nearly impossible for Ms. Ferguson to professionally

succeed.

245.244.     The discriminatory environment and culture at UM made it difficult as an older woman for Ms. Ferguson to succeed or feel welcome.

246.245.     As a result of UM's actions, Ms. Ferguson was forced to retire 2-years before she intended.  Notably, UM advertised her replacement position at a salary $35,000 over what Ms. Ferguson was being paid.

247.246.     As a result of the Defendants' actions, Ms. Ferguson lost income and benefits, as well as the opportunity for career growth.

248.247.     As a result of the Defendants' actions, Ms. Ferguson has been damaged.

## **Frieda Houser**

249.248.     Ms. Houser worked for MUS since November 2006 when she was hired as the Director of Accounting and Budgeting. At the time she resigned, her title was Director of Fiscal Affairs.

250.249.     In 2011, Sheila Stearns was the Commissioner of Higher Education and nominated Ms. Houser for the Governor's Award for Excellence.  Ms. Houser was the sole OCHE recipient of this award in 2011.  Ms. Houser also received the Governor's Award for Excellence in 2000 when she worked for the Department of Agriculture.

251.250.     Ms. Houser was qualified for her position at MUS.

252.251.   Despite Ms. Houser's qualifications, experience, and work for OCHE, similar to UM, the discriminatory culture and environment favored men to the detriment of women and it was difficult for her to professionally succeed at OCHE.

253.252.   OCHE's Chief of Staff regularly commented that he was younger than Ms. Houser, and that he trusted the male employees.

254.253.   The Commissioner also consulted and trusted the young, inexperienced male employees, in contrast to the female employees, like Ms. Houser.

255.254.   Ms. Houser advised OCHE about consequences of violating state law and policies.  Instead of valuing Ms. Houser's expertise and opinions, OCHE excluded her from meetings and decisions, and instead relied on unqualified male employees to run the office.  Questioning OCHE resulted in being perceived as being against OCHE.

256.255.   In January 2019, OCHE notified Ms. Houser her contract would not be renewed under the pretext of reorganization and reassignment of her duties.

257.256.   MUS treated Ms. Houser differently than her male colleagues by failing to listen to her concerns, not allowing her to do her job, and, ultimately, terminating her employment.

258.257.   MUS ignored and minimized Ms. Houser, devaluing her work and contributions.

~~259.~~258.      While MUS asked Ms. Houser to complete the term of her contract

and work through June 2019, the discriminatory and hostile work environment

forced Ms. Houser to resign.

~~260.~~259.      Upon information and belief, the reorganization of OCHE was

intended to get rid of older female employees. MUS abruptly ended Ms. Houser's

career, while her male counterparts with less qualifications were elevated and

supported.

~~261.~~260.      As a result of MUS's actions, Ms. Houser has lost the full value of her

employment benefits, including but not limited to her retirement benefits, and

forced to accept a decreased salary.

~~262.~~261.      As a result of Defendants' actions, Ms. Houser has been damaged.

**Sherrie Lindbo**

~~263.~~262.      Ms. Lindbo began working for OCHE in September 2014 as a

Financial Manager.  Ms. Lindbo is a Licensed Certified Public Accountant.

~~264.~~263.      Ms. Lindbo was qualified for her position at MUS.

~~265.~~264.      During her employment at OCHE, Ms. Lindbo observed the office

reorganize several times, which progressively centralized and increased the power

of the Commissioner and his cabinet members.

~~266.~~265.      Success, appointments, and promotions at OCHE were based on

"good ol' boys club" relationships, rather than an individual's qualifications.

Females were only able to succeed if they were young, beautiful, inexperienced, and "yes" people.

267.266.      When Ms. Lindbo began at OCHE, she was responsible for managing 4 staff members.  She reported directly to the Deputy Commissioner of Fiscal Affairs.

268.267.      By the time Ms. Lindbo left OCHE, OCHE had eliminated her management duties and she reported to the Director of Operations and Administration. The Director of Operations and Administration was a personal friend of the Commissioner's Chief of Staff, but had no accounting, finance, or budget experience.

269.268.      The OCHE accounting department was responsible for complying with and enforcing State and federal policies, procedures, and regulations. This was a responsibility the accounting department took seriously.

270.269.      The Commissioner and other cabinet members accused Ms. Lindbo and the accounting department of being out of control, bullies, and gone rogue, simply for asking for a signed travel form from the Chief of Staff.

271.270.      In 2018, Ms. Lindbo also notified the Director of Operations and Administration that OCHE was potentially wasting State funds on extravagant dinners.

272.271.      In response to Ms. Lindbo's actions, OCHE retaliated against Ms. Lindbo, minimizing her position, and eliminating her responsibilities, explaining that she was only technical support.

273.272.      OCHE continued to retaliate against Ms. Lindbo and treat her differently from her male colleagues, and after 5-years of working at OCHE, it did not renew Ms. Lindbo's contract in January 2019. OCHE justified the non-renewal under the auspice of restructuring.

274.273.      Ms. Lindbo was an employee in good standing, and had never been written up, received a corrective action, or a negative performance review.  Ms. Lindbo completed her job in a professional and ethical manner, always with OCHE's best interests in mind.

275.274.      OCHE filled Ms. Lindbo's position with an employee it paid more than Ms. Lindbo, and ultimately filled the permanent position with a male.

276.275.      OCHE punished Ms. Lindbo for doing her job and expressing her opinions and concerns.  OCHE would not have retaliated against or reacted in the same manner with male colleagues in this position.

277.276.      At OCHE, female employees only survive if they are a "yes" person. Intelligent women who stand up to the male leadership at OCHE do not survive.

278.277.      Ms. Lindbo last worked for OCHE in January 2019, but was paid through June 2019.

279.278.      As a result of MUS's actions, Ms. Lindbo has been forced to take a pay cut and lost employee benefits.

280.279.      As a result of the Defendants' actions, Ms. Lindbo has been damaged.

**Jennifer McNulty**

281.280.      Dr. McNulty was a tenured math professor and Interim Dean of the College of Humanities and Science at UM.

282.281.      Notably, approximately half of UM students study within the College of Humanities and Science.

283.282.      Dr. McNulty served as Interim Dean for 2-years.  Dr. McNulty was paid $30,000 less than the permanent Dean positions.

284.283.      While Dr. McNulty served as Interim Dean, and unlike other deans, she was not invited to meetings, was not invited to philanthropy planning sessions, did not have one-on-one meetings with the President, and when Dr. McNulty requested meetings with the President, her requests were denied. Despite these hurdles, as Interim Dean, Dr. McNulty met and exceeded her fundraising goals for UM, succeeded with tasks given, and received positive evaluations and praise from the Provost.

285.284.      During this period, the President even asked Dr. McNulty and another female dean to leave a meeting while the President and other UM deans, all males, remained at the meeting to work.  The President asked the female deans to leave to

take a picture documenting women at UM.  The President utilized Dr. McNulty

solely to prove that women were present at UM. However, the President limited

how Dr. McNulty could complete her job, lead, and excel.

286.285.     Dr. McNulty was qualified for her positions at UM and expertly

served her roles.

287.286.     In 2020, Dr. McNulty applied for the permanent Dean position,

having successfully led the College of Humanities and Science for the prior 2-

years.

288.287.     Ultimately, UM passed over Dr. McNulty for the permanent Dean

position and hired a male candidate with a fraction of the experience of Dr.

McNulty.

289.288.     As a result of UM's actions, to further her career, Dr. McNulty left her

home and family in Missoula, first relocating to Dillon, and eventually to Alaska.

290.289.     As a result of UM's actions, Dr. McNulty was forced to take a pay cut

and lost benefits.

291.290.     As a result of Defendants' actions, Dr. McNulty has been damaged.

\\\   \\\   \\\

### ~~Kathleen Reeves~~

292.   Ms. Reeves worked for many years as the Administrative Associate for the School of Law.  In 2018, Ms. Reeves was the Office Manager for the School of Law.

293.   Ms. Reeves was qualified for her position at UM.

294.   Ms. Reeves began working for Paul Kirgis, then Dean of the School of Law, in 2015.

295.   During her time working for Mr. Kirgis, he yelled at and belittled her.  He accused her having anger issues, when in fact he abused Ms. Reeves, forcing her to tears. He also undermined Ms. Reeves with her union.

296.   Mr. Kirgis did not treat the male employees in the same manner.

297.   UM created and fostered a hostile and discriminatory culture and environment that made it difficult for Ms. Reeves to succeed.

298.   Because of the hostile and discriminatory environment at UM, Ms. Reeves was forced to retire earlier than she had planned.

299.   As a result of the Defendants' actions, Ms. Reeves lost wages and benefits.

300.   As a result of the Defendants' actions, Ms. Reeves has been damaged.

## **Jane Doe 2**

301.291.     In the Fall of 2019, Jane Doe 2 was a teaching assistant for an upper-level major class. This was the second year that she had taught this class.

302.292.　　One of Jane Doe 2's female students informed Jane Doe 2 of a male student's stalking and harassing behavior, including unwanted, inappropriate communication. Jane Doe 2 advised her female student that she was a mandatory reporter and would have to report this stalking and harassment. The female student informed Jane Doe 2 that she had already reported it to a UM professor, who did not report the student's concerns to the Title IX office or anyone. Jane Doe 2 asked the UM professor if he had reported the stalking and harassment claims, and he confirmed he did not report the claims because it was not required under Title IX standards. Jane Doe 2 disagreed and reported the stalking and harassment.

303.293.　　Soon after, the male student came to Jane Doe 2's lab and began talking about her work, but then brought up Jane Doe 2's boyfriend.  During this time at her lab and while Jane Doe 2 assisted another student, the male student came behind Jane Doe 2, grabbed her by her shoulders, and pushed his penis against her butt in a humping motion.

304.294.　　Because of the discriminatory and hostile culture of the department and fear that nothing would happen, Jane Doe 2 did not report this incident.

305.295.　　During spring of 2020, Jane Doe 2 was teaching a course that she requested and was important for her future career goals. The male student was in her class. Given the one-on-one contact required of her teaching position, Jane Doe 2 was concerned about teaching the male student.

306.296.    Jane Doe 2 reported the humping incident with the male student to her supervisor.  Her supervisor declined to act and referred her to two other leaders in the department.  Jane Doe 2 reported the incident and her concerns to both, and one assured her that he would look for a solution.  Jane Doe 2 repeated and was clear that she did not want to lose this class assignment because of her career goals and the potential impact losing this class would have on those goals.

307.297.    Neither leader reported this incident to the Title IX office, and Jane Doe 2 ultimately reported the incident to the Title IX office.

308.298.    UM then notified Jane Doe 2, several faculty members, and a graduate student that Jane Doe 2 had concerns and would be switched to teach another class, outside of her field.

309.299.    Jane Doe 2 reported to the Title IX office that this course change was retaliation.

310.300.    The Title IX office explained to Jane Doe 2 that the courses could be switched back to the original assignment. However, when Jane Doe 2 talked with one of the department's professors, he dissuaded Jane Doe 2 from switching classes because of the disruption it would have on others.

311.301.    The male student was friends with a professor in the department and received preferential treatment. To the contrary, UM changed the opportunities available to Jane Doe 2.

312.302.    Upon information and belief, the Title IX office has received 5 reports of inappropriate, unwanted sexual behavior by the male student against other students.

313.303.    Since reporting the assault, Jane Doe 2 has been treated differently by the professors and supervisors in her department.  Her supervisor has told her to "get over it" after she has explained her struggles with feeling safe in her lab, which she needs to access to complete her education and professional goals. Jane Doe 2's male colleagues are not treated in the same way.

314.304.    Since reporting the assault, her supervisor has retaliated against her targeting her in the research lab, group meetings, and by email.

315.305.    UM did not properly address Jane Doe 2's reports of sexual assault, but have instead have fostered a hostile and discriminatory environment, and retaliated against Jane Doe 2.

316.306.    UM favored the male student, to the detriment of Jane Doe 2.

317.307.    As a result of UM's actions, Jane Doe 2 has altered her educational and professional paths.

318.308.    As a result of Defendants' actions, Jane Doe 2 has been damaged.

### **Vida Wilkinson**

319.309.    Dr. Wilkinson has a Ph.D. from Colorado State University in Education and Human Resource Studies.

320.310.　　Dr. Wilkinson served as Director of Outreach at the Missoula College, UM's 2-year college, since 2012.

321.311.　　In January 2018, Dr. Wilkinson applied to be Interim Dean of Missoula College.

322.312.　　In March 2018, the Interim Provost advised Dr. Wilkinson that President Bodnar supported her decision to hire Dr. Wilkinson as the Interim Dean. Dr. Wilkinson accepted the Interim Dean position.

323.313.　　Upon information and belief, MUS reversed the decision to hire Dr. Wilkinson as Interim Dean and determined that Missoula College would continue with the acting Dean, a male.

324.314.　　Ultimately, UM filled the Interim Dean position with a male candidate who was less qualified than Dr. Wilkinson.  UM then eventually selected a male as Dean of Missoula College.

325.315.　　Despite having the best qualifications and experience for this position, and being offered the position, the Defendants treated Dr. Wilkinson's male colleagues differently, creating every opportunity for men to serve as the Dean of Missoula College.

326.316.　　The Defendants created a brick wall for Dr. Wilkinson's career.

327.317.　　As a result of UM's actions, Dr. Wilkinson was forced to leave her home in Missoula, relocating first to South Dakota, then to South Carolina.

328.318.    As a result of UM's actions, Dr. Wilkinson was forced to take a pay cut and lost benefits.

319.   As a result of Defendants' actions, Dr. Wilkinson has been damaged.

### Vandi Theriot

320.   In the Fall of 2022, UM sought applicants for the position of Vice President for People and Culture.

321.   The position was offered at a salary range of $155,000 to $165,000 per year.

322.   Upon information and belief, UM created this position in response to the multiple claims of discrimination against it, including, but not limited to, this lawsuit.

323.   In 2022, Ms. Theriot applied for the Vice President for People and Culture position.

324.   Ms. Theriot went through an extensive vetting process, spanning 3-months. Ms. Theriot excelled at every step.

325.   Ms. Theriot is a strong leader, with exceptional qualifications for the Vice President of People and Culture position.

326.   The UM search/hiring committee selected Ms. Theriot as the best candidate for the Vice President for People and Culture position.

327.   Ms. Theriot is 50-years old and not an obviously athletic woman.

328.   Upon information and belief, President Bodnar did not want to hire Ms. Theriot. President Bodnar did not want to pass over an internal UM candidate ("Internal Candidate") for this position.  However, the Internal Candidate was not qualified for the position.

329.   After Ms. Theriot learned that the search/hiring committee selected her for the Vice President for People and Culture position, at the direction of President Bodnar, UM requested that Mr. Theriot:

   a.      provide additional references, despite UM missing a scheduled meeting with one of Ms. Theriot's original references; and

   b.      talk with the Deputy Commissioner of Human Resources at MUS.

330.   President Bodnar repeatedly questioned Ms. Theriot's confidence in her ability to fulfill the role of Vice President for People and Culture.  Ms. Theriot was confident in her ability to be successful in this position, as was the search/hiring committee.

331.   On or about January 20, 2023, President Bodnar offered Ms. Theriot the position of Vice President for People and Culture with a 16-month contract and at a salary of $155,000, the lowest potential salary in the proposed salary range. President Bodnar further explained that the salary would be increased to $161,000 effective July 1, 2023, and contract renewal would be subject to 6-months-notice.

332.   Upon information and belief, UM's offer to Ms. Theriot would have paid Ms. Theriot the lowest salary of its Vice Presidents.

333.   President Bodnar and Ms. Theriot agreed on the terms of her employment. President Bodnar explained that she would receive the finalized contract on January 27, 2023.

334.   President Bodnar also explained that the new structure for Ms. Theriot's position would include a new position—an Associate Vice President.  President Bodnar explained that MUS had just approved creating this new position.

335.   President Bodnar further explained that the Internal Candidate would be promoted to Associate Vice President and was willing to accept the role for a salary of $120,000.

336.   The Associate Vice President position did not have a position description outlining the minimum qualifications or responsibilities.

337.   The Associate Vice President position description was not posted for a public or internal candidate search; despite, equal opportunity, nondiscrimination, and affirmative action obligations requiring the Defendants to do so. Ms. Theriot notified President Bodnar about these requirements, but President Bodnar ignored these requirements, explaining that the optics of this decision were not a concern because the Internal Candidate had completed a rigorous open forum process as an applicant for the Vice President for People and Culture.

338.   That throughout the hiring process, Ms. Theriot observed President Bodnar focus on the optics of his decisions, rather than the process, merits, and content of the actions.

339.   President Bodnar then requested that Ms. Theriot complete transitional work over the weekend, including but not limited to, reviewing the Internal Candidate's open forum and planning next steps for the People and Culture sector.  During that weekend and the next week, Ms. Theriot completed this work for UM.

340.   Thru this process, rather than empowering Ms. Theriot's skill set and expertise to build the structure for the People and Culture sector, President Bodnar insisted that the structure be built for her.

341.   President Bodnar treated Ms. Theriot with distrust and micromanagement.

342.   Ms. Theriot offered UM, including but not limited to President Bodnar, constructive feedback and coaching to grow an equitable workplace.  Ms. Theriot invested significant thought, time, and professional expertise into how UM could accomplish its principle "Mission First, People Always."

343.   Due to UM's actions and agreements, Ms. Theriot declined and withdrew from the interview process for other employment positions.

344.   On January 25, 2023, President Bodnar informed Ms. Theriot that UM would not proceed with its offer and agreement that she be the Vice President for People and Culture.

345.   President Bodnar explained that UM would transition the Internal Candidate into the Associate Vice President's role and build out the People and Culture sector before hiring the Vice President for People and Culture.

346.   Despite having the best qualifications and experience for this position, being the search/hiring committee's selected candidate, being offered the position, and Ms. Theriot accepting the offer, the Defendants treated Ms. Theriot differently than the young, athletic Internal Candidate.

347.   The Defendants benefited from Ms. Theriot's expertise and ideas through this process, including but not limited to, the week of transitional work for UM, but did not compensate Ms. Theriot.

348.   The Defendants took advantage of Ms. Theriot's expertise, and her understanding that the Defendants would follow thru on its agreements with and promises to her.

349.   The Defendants fostered and facilitated a hostile environment and decisions that created a very narrow path to professional success for women.

350.   The Defendants created a brick wall for Ms. Theriot's career.

351.   The Defendants treated Ms. Theriot differently on the basis of her sex.

352.   The Defendants retaliated against Ms. Theriot because of her feedback and statements regarding the claims of discrimination against UM, including but not limited, to this lawsuit.

353.   As a result of UM's actions, Ms. Theriot declined other employment opportunities.

354.   As a result of UM's actions, Ms. Theriot has lost wages and professional opportunities.

**Jackie Hedtke**

330.   Ms. Hedtke began working at the Adams Center at UM in July 2006 as the Assistant Director for Operations.

331.   Ms. Hedtke had wide ranging responsibilities, including but not limited to, upkeep, safety, cleanliness, security, budget, staffing, special events, purchasing equipment/materials/supplies, and day-to-day operations of the Adams Center.

332.   Ms. Hedtke was qualified for her position at UM.

333.   Ms. Hedtke enjoyed her work at the Adams Center and worked hard to learn and master her position. During her time at the Adams Center, it hosted concerts, speakers, galas, trade shows, athletic events, and even a future President of the United States.

334.   In 2012, UM hired a male director of the Adams Center.

335.   During Ms. Hedtke's time working for this male director, he:

      a.     belittled and minimized her;

b.      dismissed and refused to consider her feedback, which was based on her prior 6 years' experience;

c.      became angry with her for suggesting alternative solutions to working a 36-hour shift, which she did work;

d.      had her attend a meeting so that another women would join the meeting, placing Ms. Hedtke in inappropriate and uncomfortable position; and

e.      refused to afford her the respect of eye contact when speaking with her.

336.   Ms. Hedtke is a lesbian.

337.   Upon information and belief, because of Ms. Hedtke's gender and sexual orientation, this male supervisor treated her poorly and retaliated against her.

338.   After 7 years of working for the Adams Center, in 2013, the male supervisor did not renew Ms. Hedtke's contract, explaining that he had changed the job description.

339.   The new job description favored male candidates to fill the position, not Ms. Hedtke. The new job description: (a) included tasks that Ms. Hedtke was not certified to complete and were previously completed by outside vendors; and (b) required the position to attend all athletic events.

340.   Ms. Hedtke's career was taken from her because the male director wanted a male to fill her position.

341.   A male was hired to fill the position and to replace Ms. Hedtke.

342.   Upon information and belief, the male director did not treat the male employees in the same manner.

343.   UM created and fostered a hostile and discriminatory culture and environment that made it difficult for Ms. Hedtke to succeed.

344.   Because of the hostile and discriminatory environment at UM, Ms. Hedtke's contract was not renewed.

345.   As a result of the Defendants' actions, Ms. Hedtke lost wages and benefits.

346.   As a result of the Defendants' actions, Ms. Hedtke has been damaged.

### Laura John

347.   In 2006, UM admitted Ms. John as graduate student in the Clinical Psychology program, seeking a Ph.D.

348.   As a graduate student, UM also employed Ms. John.

349.   Ms. John is Native American.

350.   Ms. John was drawn to UM's Department of Psychology because of its stated support and promotion of Native American students.

351.   UM received a grant from the Indians Into Psychology (InPsych) Program, a federally funded mandate through Indian Health Services, which was designed to

recruit, train, and graduate Native American clinical psychologists considering, among other reasons, the mental health needs of tribal communities and the unique needs of Native American students.  Ms. John was part of the InPsych Program at UM.

352.   While at UM, it became clear that to successfully navigate the Department of Psychology and graduate, women could not be outspoken or challenge the Department.

353.   Ms. John was outspoken and challenged the Department when faculty did not follow policies and when the Department did not comply with the InPsych funding mandates.

354.   While at UM, the Chair, Director of Clinical Training, and other faculty of the Department of Psychology, all men, minimized, diminished, yelled at, manipulated, and shamed Ms. John.

355.   Ms. John was a single mother of young children during this period.

356.   As her children's only caretaker, she had to prioritize her children's needs. Ms. John required accommodations and time to successfully graduate.

357.   In 2011, UM ultimately weaponized the faculty advice, accommodations, and time that UM provided Ms. John, using such to justify denying her candidacy in the Ph.D program.

358.   After 5-years in the Department, the Chair informed Ms. John that she was "not Ph.D material" and would not receive her Ph.D from UM.  The Chair had decided for Ms. John that she could only pursue and receive a master's degree.

359.   The Chair explained that because Ms. John's educational progress was slower than the standard progression, she could not graduate with a Ph.D.

360.   Ms. John's pace through the program did not significantly differ from the pace of other students.

361.   Ms. John's education was slower because she was a single mother.  Effectively, Ms. John was punished for being a single mother, and seeking accommodations and time to be a successful graduate student.

362.   As a result of this denial of candidacy, Ms. John lost employment and income opportunities that required her to be a Ph.D candidate.

363.   Upon information and belief, the Department of Psychology did allow male students, and female students who were not outspoken and did not challenge the Department, additional accommodations and time to graduate, keeping their doors for academic and professional growth open for successful graduation.

364.   Upon information and belief, outspoken, strong women, including Ms. John, were forced out of the Department.

365. Upon information and belief, UM waited for Ms. John to invest 5 years before UM ended her education in the Clinical Psychology program because of the minimum Native American student requirements for InPsych funding recipients.

366. Rather than transparently inform Ms. John early in her education at UM that she would not receive a Ph.D, UM waited until she had accrued significant student debt and had limited, if any, options to further pursue her Ph.D.

367. UM created a hostile and discriminatory culture and environment, resulting in Ms. John being denied candidacy for the Ph.D program and the opportunity to be a successful student.

368. UM's hostile and discriminatory culture and environment forced Ms. John to alter her educational and professional paths.

369. As a result of Defendants' actions, Ms. John's professional and income opportunities were limited.

370.355. As a result of Defendants' actions, Ms. John has been damaged. As a result of Defendants' actions, Ms. Theriot has been damaged.

### Class Action

371.356. Pursuant to the Order (Doc. 58 at 29), Plaintiffs reserve the ability to request for class certification as this matter proceeds.

~~372.~~357.     Plaintiffs have standing to bring this class action because they are members of the defined class, have the same interest as all class members, and have suffered the same injury as the class members.

~~373.~~358.     The facts stated above are common to all class members.

\\\  \\\  \\\

## *Class Description*

~~374.~~359.     The class description is identifiable individuals who:

a.     were employed by the Defendants at any point since 2013,

b.     because of UM's and MUS's discriminatory culture, the individual was "on the basis of sex" treated unfavorably, treated differently from men, harassed, retaliated against, or discriminated against, and

c.     the individual was:

i.     forced to resign,

ii.     the Defendants terminated their position, and/or

iii.     the Defendants created no, or limited, options for professional growth.

~~375.~~360.     In order to be certified, a class has to comply with the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the prerequisites of Federal Rule of Civil Procedure 23(b).  As described in the following paragraphs, this class satisfies all elements.

*Federal Rule of Civil Procedure 23(a)(1)*

~~376.~~361.     Under Federal Rule of Civil Procedure 23(a)(1), a class may be certified if: "the class is so numerous that joinder of all members is impracticable."

\\\   \\\   \\\

~~377.~~362.     Upon information and belief, the Defendants have engaged in the above described discriminatory conduct since at least 2013 and that these actions continue today.

~~378.~~363.     Plaintiffs are aware of many other women who have experienced the same harassing, discriminatory, and retaliatory conduct, but continue to fear retaliation by joining this litigation as a named plaintiff.  To date, Plaintiffs' counsel have been contacted directly by many women who have shared experiences of the Defendants' harassing, discriminatory, and retaliatory conduct, with the total number continuing to grow. Of these women, only 18 have taken the difficult step of being named as a plaintiff.

~~379.~~364.     Putative class members will likely come forward and share their experiences at different times, making it judicially efficient to amend the Complaint once to include class claims, rather than repeated amendments with additional plaintiffs.

380.365.    If necessary, Plaintiffs' reserve the right to seek leave of the Court to amend these pleadings in the future, when and if other women are able to join this lawsuit.

381.366.    "Fear of retaliation—in, for example, civil rights or employment cases—is an additional factor that occasionally argues for relaxing the numerosity requirement generally (not just in terms of sheer numbers of class members), as such a fear might deter potential plaintiffs from suing individually, making a representative action especially pertinent." William B. Rubenstein, 1 *Newberg on Class Actions* § 3:12 (5th ed.) (June 2021 Update).

382.367.    Defendants' culture of retaliation and intimidation against women who speak out continues today.  Defendants' disingenuous attempts to discredit the named Plaintiffs directly threatens and discourages other potential plaintiffs from joining this lawsuit.  Understandably, many women fear publicly joining this lawsuit because of these threats, which makes joinder of all class members impracticable.

383.368.    This real threat of retaliation is reflected by 16 of the 18 (88.9%) of the named Plaintiffs no longer work for the Defendants.

384.369.    Upon information and belief, the Defendants have discriminated against multiple dozens, if not hundreds, of women, limiting and adversely impacting their career paths and opportunities.

385.370.    Upon information and belief, the Defendants have discriminated against multiple dozens, if not hundreds, of women, creating a brick wall for their careers.

386.371.    Given the duration of this conduct, it is certain that a large number of women have been adversely affected by the Defendants' actions.

387.372.    Given many of the named Plaintiffs were forced to move out of Montana because of the Defendants' actions, it is likely that the class members are geographically disperse, living outside of Montana and even outside of the United States.

388.373.    The applicable law and facts in this case are common to all class members.

389.374.    Numerosity, interests of judicial economy, geographically disperse class members, and the fear of retaliation indicate that joinder of all class members is impracticable in this matter.

### _Federal Rule of Civil Procedure 23(a)(2)_

390.375.    Under Federal Rule of Civil Procedure 23(a)(2), a class may be certified if: "there are questions of law or fact common to the class."

391.376.    The operative questions of law and fact, which are presented by this action, are common to all members of the class.

392.377.   This case addresses whether the Defendants violated the rights of the Plaintiffs and class members by failing to comply with Title IX, their own policies, and state law. These are common questions of law.

393.378.   The fact that the class members all suffered from gender discrimination, harassment, and retaliation, violating Title IX, the Defendants' policies, and state law, are common questions of fact.

394.379.   The questions of law and fact are common to the class.

\\\   \\\   \\\

### *Federal Rule of Civil Procedure 23(a)(3)*

395.380.   Under Federal Rule of Civil Procedure 23(a)(3), a class may be certified if: "the claims or defenses of the representative parties are typical of the claims or defenses of the class."

396.381.   Plaintiffs' claims are typical of the claims of all class members in that their claims arise from the same course of conduct giving rise to the claims of other class members.

397.382.   Plaintiffs and the putative class were damaged when the Defendants discriminated, harassed, and retaliated against them "on the basis of sex."

~~398.~~383.    The legal theories that form the basis of the claims brought by Plaintiffs are identical to the legal theories that form the basis of the claims of all class members.

~~399.~~384.    The Plaintiffs' claims are typical of the claims of the class.

*Federal Rule of Civil Procedure 23(a)(4)*

~~400.~~385.    Under Federal Rule of Civil Procedure 23(a)(4), a class may be certified if: "the representative parties will fairly and adequately protect the interests of the class."

~~401.~~386.    Plaintiffs are members of the class.  Plaintiffs and all class members have suffered losses and have been damaged as a result of the Defendants' actions.

~~402.~~387.    Plaintiffs' interests are identical to, and not antagonistic towards, those of other class members.

~~403.~~388.    Plaintiffs have a personal financial stake in the outcome of this lawsuit, are dedicated to ensuring that the Defendants' conduct ends and does not continue in the future, and are committed to conscientiously representing the class.

~~404.~~389.    Plaintiffs have retained qualified, experienced counsel who are able to conduct this litigation.  They are licensed to practice law in Montana and are attorneys in good standing.  The undersigned attorneys hereby certify that they will fairly and adequately protect the interests of the class.

405.390.     Plaintiffs and the undersigned counsel will fairly and adequately

protect the interests of the class.

### *Federal Rule of Civil Procedure 23(b)(1)*

406.391.     Under Federal Rule of Civil Procedure 23(b)(1), a class may be

certified if:

> prosecuting separate actions by or against individual class members
> would create a risk of:
> (A) inconsistent or varying adjudications with respect to individual
> class members that would establish incompatible standards of conduct
> for the party opposing the class; or
> (B) adjudications with respect to individual class members that, as a
> practical matter, would be dispositive of the interests of the other
> members not parties to the individual adjudications or would
> substantially impair or impede their ability to protect their interests….

407.392.     The class is large in number and widely geographically dispersed

throughout Montana, the United States, and other countries, given how long the

Defendants have been acting illegally.

408.393.     The Plaintiffs seek to change the Defendants conduct. Multiple

adjudications would create differing and incompatible determinations regarding the

Defendants' conduct and the remedies for such, which would substantially impair

the ability for the Plaintiffs and/or putative class to protect their interests.

### *Federal Rule of Civil Procedure 23(b)(2)*

409.394.     Under Federal Rule of Civil Procedure 23(b)(2), a class may be

certified if Defendants have: "acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole….”

410.395.    Here, Plaintiffs and the putative class seek injunctive and declaratory relief, which would affect all class members’ rights.

411.396.    The Defendants’ actions have acted in a manner applicable to the class as a whole.  Therefore, it is appropriate that the injunctive and declaratory relief requested by Plaintiffs be applied to the class as a whole.

412.397.    The Plaintiffs and putative class seek to end this discriminatory conduct and ensure that it does not continue in the future.  The injunctive and declaratory relief sought are important remedies and should benefit the entire class population.

## *Federal Rule of Civil Procedure 23(b)(3)*

413.398.    Under Federal Rule of Civil Procedure 23(b)(3), a class may be certified if: “the questions of law and fact common to class members predominate over any questions affecting only individual members, and … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.”

414.399.    Given the fears of retaliation and benefits of anonymity, class members have little interest in individually controlling this litigation, but rather benefit from a representative class action.

415.400.    There is no other known litigation involving the putative class.

416.401.    There is no other appropriate forum for this litigation.

417.402.    There are no known difficulties of managing this class action.

418.403.    Given the potential for some class members to have relatively low

monetary value damages, the economic realities direct that this matter should

proceed as a class action or not at all.

419.404.    The legal and factual issues of the class members predominate those

affecting individual members, and this class action is the superior method to

litigate this matter fairly and efficiently.

## Count 1 –Violation of Title IX

420.405.    Plaintiffs, individually and on behalf of all others similarly situated,

reallege all the facts set out in foregoing paragraphs and alternate counts of this

Complaint.

421.406.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et

seq*., provides:

> No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or be
> subjected to discrimination under any education program or
> activity receiving Federal financial assistance. …

> [A]n educational institution means any public or private preschool,
> elementary, or secondary school, or any institution of vocational,
> professional, or higher education, except that in the case of an
> educational institution composed of more than one school, college,
> or department which are administratively separate units, such term

means each such school, college, or department.

422.407.    The Defendants receive federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a), subjecting them to the requirements of Title IX.

423.408.    Defendants had notice when they accepted federal funding under Title IX that they would be liable for its actions that violate Title IX, including gender discrimination, harassment, and retaliation.

424.409.    Plaintiffs and the putative class are members of a protected class.

425.410.    The Defendants had actual knowledge of the persistent violations of Title IX, including the allegations outlined above.

426.411.    The Defendants were deliberately indifferent to these allegations, and failed to take any action to remedy the situations in violation of their policies and Title IX.

427.412.    The Defendants frequently subjected Plaintiffs and the putative class to unwelcome harassment, retaliation, and humiliation, "on the basis of sex," with such severity, pervasiveness, and objective offensiveness that it created an abusive work environment and interfered, and continues to interfere, with the Plaintiffs' and the putative class' work performance.

428.413.   The Defendants created an unsafe work environment for the Plaintiffs and the putative class because UM failed to provide a work environment free from physical, financial, and professional threats and retaliation based on gender.

429.414.   The Defendants failure to comply with Title IX has damaged and threatened Plaintiffs' and the putative class' financial security, career security, and physical security.

430.415.   The Defendants knew, or should have known, that "on the basis of sex," the Plaintiffs and the putative class were "excluded from participation in[,] denied the benefits of[, and] subjected to discrimination" at UM and MUS.

431.416.   The Defendants should have immediately taken action to:

    a.    End the harassment and discrimination,

    b.    Eliminate the hostile environment,

    c.    Prevent recurrence, and

    d.    Remedy the effects.

432.417.   The Defendants failed to take any of these actions in violation of their policies and Title IX.

433.418.   Instead, Defendants took adverse action against the Plaintiffs and the putative class, forcing Plaintiffs and the putative class to resign, terminating their position, and/or creating no options for professional growth.  All of these actions evidence the Defendants' failure to adequately respond.

434.419.     Plaintiffs and the putative class were qualified for their positions, and were subjected to adverse employment actions despite their qualifications.

435.420.     Similarly situated men in Plaintiffs' and the putative class' roles did not receive the same treatment as Plaintiffs and the putative class.

436.421.     Defendants retaliated against the Plaintiffs and the putative class based on gender.

437.422.     Defendants created such a seriously hostile environment "on the basis of sex" that Defendants denied and/or limited the Plaintiffs' and the putative class' participation in its programs and activities.

438.423.     Defendants' actions directly violated their policies and federal law.

439.424.     As a result of Defendants' actions, the Plaintiffs and the putative class have been damaged in an amount to be determined at trial.

## Count 2-Breach of Covenant of Good Faith and Fair Dealing

440.425.     Plaintiffs, individually and on behalf of all others similarly situated, reallege all the facts set out in the foregoing paragraphs and alternate counts of this Complaint.

441.426.     Defendants entered into contracts with Plaintiffs and the putative class.

442.427.     Each contract contains an implied covenant of good faith and fair dealing.

443.428.    Breach of the covenant is a breach of the contract.

444.429.    A breach of an express term of the contract is not a prerequisite to a breach of the implied covenant.

445.430.    The conduct required by the implied covenant is honesty in fact and the observance of reasonable standards of fair dealing in the trade.

446.431.    Defendants breached the implied covenant of good faith and fair dealing by depriving Plaintiffs and the putative class the Title IX benefits to which they were lawfully entitled.

447.432.    As a result of Defendants' actions, the Plaintiffs and the putative class have been damaged in an amount to be determined at trial.

## Jury Trial Demand

Plaintiffs and the putative class hereby demand trial by jury on all issues.

## Prayer for Relief

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray judgment against all Defendants, jointly and severally, as follows:

1.    For a judgment in favor of Plaintiffs and the putative class and against Defendants on all Counts.

2.    As soon as practicable determine by order that this class action may be maintained, as set forth in Federal Rule of Civil Procedure 23(c).

3.     For certification of the Class Action pursuant to the Federal Rules of Civil

Procedure, and a class of identifiable individuals who:

    a.     were employed by the Defendants at any point since 2013,

    b.     because of UM's and MUS's discriminatory culture, the individual

was "on the basis of sex" treated unfavorably, treated differently from men,

harassed, retaliated against, or discriminated against, and

    c.     the individual was:

        i.     forced to resign,

        ii.     the Defendants terminated their position, and/or

        iii.     the Defendants created no, or limited, options for professional

        growth.

4.     For an order requiring the Defendants, at their expense, to identify and

advise each and every class member of this lawsuit and their potential entitlement

to damages.

5.     For an order requiring the Defendants to identify and pay the Plaintiffs and

class members damages in a reasonable amount to compensate the Plaintiffs and

class members for all harm they have suffered as a result of the Defendants'

conduct.

6.     For injunctive relief ordering the Defendants to calculate the amount of

damages owed to Plaintiffs and the class members.

7.     For injunctive relief ordering the Defendants to pay such amount plus interest.

8.     For declaratory judgment declaring Defendants' discriminatory practices violate Title IX, their policies, and Montana law.

9.     For injunctive relief directing Defendants to cease these discriminatory practices and to implement procedures and policies to ensure that these discriminatory practices do not occur in the future.

10.    For compensatory damages in an amount to be determined at trial to compensate Plaintiffs and the class members.

11.    For damages in an amount to be determined at trial to compensate Plaintiffs and the class members for all past, present, and future mental anguish and emotional distress.

12.    For an incentive award for the named Plaintiffs and class representatives.

13.    For all costs, including but not limited to expert fees, incurred in the prosecution of this action.

14.    For an award of interest, as deemed appropriate by the Court and as allowed by law.

15.    For an award of attorney's fees, as the same may be allowed by law.

16.    For such other and further relief, both at law and in equity, as the Court shall deem just and proper.

Dated this 8th day of May, 2023.

/s/ Hillary P. Carls
Hillary P. Carls
Sherine D. Blackford
Veronica A. Procter
*Attorneys for Plaintiffs*